# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

JOE EDWARD JOHNSON,
Defendant and Appellant.

S029551

Sacramento County Superior Court
58961

November 25, 2019

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Chin, Corrigan, Kruger and Groban concurred.

Justice Liu filed a dissenting opinion.

Justice Cuéllar filed a dissenting opinion in which Justice Liu concurred.

PEOPLE v. JOHNSON

S029551


Opinion of the Court by Cantil-Sakauye, C. J.


A jury convicted defendant Joe Edward Johnson of the first degree murder of Aldo Cavallo, and found true the special circumstance allegation that defendant committed the murder while engaged in a home invasion robbery.  (Pen. Code,[1] §§ 187, subd. (a) [murder], 190.2, subd. (a)(17)(i) [robbery murder].)  The jury also convicted defendant of the forcible rape (§ 261, subd. (a)(2)) and assault with intent to commit murder (former § 217) of Mary S.  The jury returned a verdict of death, and the trial court sentenced defendant accordingly.

An automatic appeal followed.  (§ 1239, subd. (b).)  This court initially held that the trial court had committed reversible error under *People v. Shirley* (1982) 31 Cal.3d 18, by admitting into evidence the hypnotically induced identification of defendant by Mary S., and we reversed all convictions and the death sentence on that basis.  However, we subsequently granted the People's petition for rehearing, vacated our earlier decision, and issued an opinion reversing the rape and assault convictions but affirming the murder conviction and special circumstance finding.  (*People v. Johnson* (1988) 47 Cal.3d 576.)  We also reversed the judgment of death due to the trial court's erroneous jury instruction on the possibility of future

_____

[1]     All further undesignated statutory references are to the Penal Code.

1

commutation under *People v. Ramos* (1984) 37 Cal.3d 136. (*People v. Johnson*, at p. 603.)

The prosecution retried the penalty phase based on the murder conviction and special circumstance finding. It elected not to retry defendant on the rape and related charges. The first penalty phase retrial ended in a mistrial in 1991. The jury in the second penalty phase retrial returned a death verdict in 1992, and the trial court sentenced defendant to death. This appeal is automatic. We affirm the judgment in its entirety.

## I. SUMMARY OF FACTS

### A. Prosecution Evidence

The People presented the following evidence during the second penalty phase retrial.

#### 1. *Robbery and murder of Aldo Cavallo*

One evening in late July 1979, defendant removed the screen from an open kitchen window to enter Cavallo's apartment via the back door. Defendant retrieved a dumbbell from the apartment's second bedroom, walked to the master bedroom, and then struck a sleeping Cavallo once or twice in the temple. The chain lock on the front door was still in place, suggesting defendant exited the way he had entered.

Police responding to a neighbor's welfare check found Cavallo's apartment in shambles: drawers were open with contents dumped on the floor and a television sat on the floor in the hallway. Two guns — one a shotgun and another a shotgun or a rifle — and ammunition were lying on the floor. Cavallo's body was found on his bed under the covers. His head was covered with blood. On the foot of the bed lay a dumbbell or barbell with traces of blood and hair on it. The cause of death was determined to be a single major blow to the right temporal

area, consistent with having been caused by the dumbbell found at the scene.

Investigators found a window screen, apparently taken from the open window, leaning against a patio chair. A latent fingerprint was obtained from the removed kitchen screen, and a fingerprint expert identified the print as belonging to defendant.

Inside the apartment, officers found a receipt for a Bohsei portable television but did not locate the accompanying television. They contacted the manufacturer and received a copy of the warranty paperwork, including the television's serial number. The officers subsequently conducted a parole search of defendant's apartment and located the missing television set. Cavallo's close friend confirmed she had seen the found television in Cavallo's kitchen.

The prosecution read the testimony of three witnesses from prior trials concerning Cavallo's ownership of a .22-caliber handgun, including friend Richard Canniff. Cavallo had told Canniff on multiple occasions that he kept a handgun in his nightstand for protection. Officers did not locate a handgun in Cavallo's apartment, but they found an open box of .22-caliber cartridges on the dining table and a second box in the bedroom closet. Cavallo's ex-wife, who was available for the second penalty phase retrial, testified that he owned a .22-caliber handgun.

### 2. *Evidence in aggravation*

At the second penalty phase retrial, the prosecution presented evidence of defendant's rape and assault of Mary S. as evidence in aggravation under section 190.3, factor (b) (presence or absence of criminal activity involving the use,

attempted use, or threats to use force or violence). The prosecution also presented evidence that defendant had four prior felony convictions as evidence in aggravation under section 190.3, factor (c) (presence or absence of any prior felony conviction), and that defendant had committed one additional previously uncharged aggravating act of criminal violence under section 190.3, factor (b).

### a. *Rape and assault on Mary S.*

Four days after Cavallo was robbed and murdered, Mary S. attended mass at her church. She stayed behind in her pew after mass ended. Defendant entered the church, approached Mary S., and asked her where the priest's house was. Defendant started to walk away after Mary S. provided him directions, but turned around and walked back toward her holding a gun. He said, "Keep quiet and you won't get hurt, and come with me."

Defendant directed Mary S. into a bathroom at the back of the church. He fired his gun into the toilet seat and said he would not hurt her if she remained quiet. He ordered Mary S. to take off her pants and "[g]et on the toilet," and then raped her. After instructing Mary S. to put her pants back on, defendant asked if she had any money. She said she had only change. Defendant took her purse and looked inside. He shoved the purse into Mary S.'s hands and told her to pull her sweater over her head. Defendant struck Mary S. on the head with his gun, which broke into pieces.

After putting her sweater over her head, the next thing Mary S. remembered was "groping" her way out of the back room and into the church. She approached a woman in the pews and asked for help. Mary S. was rushed into surgery to treat a depressed skull fracture. The neurosurgeon opened her scalp,

removed fragments of bone, and sutured a cut on the dura. The surgeon counted 10 individual wounds on Mary S.'s skull caused by both blunt force and sharp force. The wounds were consistent with having been caused by a semiautomatic pistol. Mary S. suffered loss of smell, postoperative vertigo, and amnesia regarding some aspects of the attack.

When Mary S. awoke from surgery, a police detective showed her more than 50 photographs of possible suspects, which included a photograph of defendant. Mary S. also reviewed photographs at her home after she was released from the hospital. She did not recognize her assailant among the photographs.

Doctors collected sexual assault evidence at the request of the police. A criminalist compared the blood types of Mary S. and defendant and determined they both had type O blood. The vaginal swab contained a mixture of vaginal fluid and semen, both of which were contributed by a donor or donors with type O blood. The criminologist was unable to conclude whether defendant was the source of the semen.

The handgun's broken pieces, some of which had traces of human blood, were found at the scene. Officers found and lifted at least one latent fingerprint on the gun's magazine. A fingerprint expert concluded that defendant's prints matched those found on the magazine.

The criminologist compared the cartridges found in the magazine to the live ammunition recovered from Cavallo's apartment. He found that all the cartridges had been manufactured by the Federal Cartridge Company with no discernable difference in type, caliber, or overall physical

characteristics. The letter "F" logo on all of the bullets appeared to have been marked by the same tool.

### b. Stabbing of Verna O.

In 1978, Verna O. met defendant when she was working as a janitor at a Sonoma hospital. Sometime after that, he moved in with her and they developed a relationship. About two weeks later, Verna O. asked defendant to leave because of his controlling and threatening behavior. He had previously told her that he would decapitate her children and grandchildren if she "did anything against him."

In early December 1978, defendant, Verna O., and her friend, Lisa, were at home. Verna O. and Lisa prepared to leave the house because defendant had previously asked Verna O. not to be home that evening, when his friends were coming over. Defendant screamed at Verna O., ordered her not to leave the house, and slapped her. He then retrieved a knife from the bedroom and stabbed Verna O. in the neck and chest. Defendant told Verna O. that she "would be dead in two minutes." Verna O. asked defendant to leave her alone and let her die in peace. He went back into the bedroom, and Verna O. staggered outside. Lisa took Verna O. to the hospital, where Verna O. remained for several days.

Defendant was convicted of assaulting Verna O. with a deadly weapon (former § 245, subd. (a)(1)).

### c. Assault on Thomas Scott

The prosecution read prior testimony from Thomas Scott, who was deceased at the time of the second penalty phase retrial. Scott was housed with defendant in a state medical facility in 1973. One evening, Scott was in bed when defendant started yelling and called Scott a vulture, accusing him of owing

defendant a jar of coffee and cigarettes. Defendant hit Scott with a chair, knocking him unconscious. Scott received stitches on his chin and suffered permanent nerve damage to his left eye.

Defendant was convicted of assault with a deadly weapon while confined in state prison (§ 4501).

### d. *Attack on Officer Laughlin and prison escape*

After the assault on Scott, defendant was incarcerated at a correctional facility in Chino. In April 1974, Correctional Officer Steven Laughlin supervised defendant and two other inmates while they worked on landscaping in an area between the prison building and the fencing surrounding the institution. One of the inmates struck Laughlin from behind, hitting him in the head and causing him to fall. As Laughlin tried to stand up, defendant hit him in the face multiple times and knocked him back to the ground. The first inmate walked away and remained seated nearby until the end of the incident, but the second inmate and defendant dragged Laughlin to the side of the building, tied him up, gagged him, and continued to hit him. Laughlin saw defendant and the second inmate run toward the fence and climb over. Laughlin was taken to a local hospital, where he received 19 stitches on his face and head.

Defendant was apprehended within 24 hours. He pleaded guilty to committing an escape with force (§ 4530, subd. (a)), and was sent to a state hospital for treatment.

### e. *Attempted murder and witness threat on Florence M.*

In September 1971, defendant moved in with his half-brother, Priestley M., and Priestley's wife, Florence M. At the time, Florence M. was several months pregnant and on maternity leave.

Some months later, Florence M. was at home talking on the phone when defendant asked her to hang up because he needed to make a phone call. She responded that he could use the phone, but she wanted to finish her conversation first. Defendant approached Florence M. holding a large kitchen knife and stabbed her numerous times. He also struck her in the face and head with his fists. Florence M. curled up on the floor and tried to shield her stomach. Using the knife, defendant wounded her multiple times on her face and twice on her legs. Florence M. tried to stop him by grabbing the blade with her right hand, causing a deep cut that left a significant scar. She managed to get away and crawl from the bedroom to the living room before collapsing. Defendant initially ignored Florence M. but then returned and repeatedly stabbed her in the back. The knife broke into pieces while defendant was stabbing her. Defendant left the room to get a new knife. Priestly arrived home as defendant was returning with a steak knife. Defendant fled the house when he saw his brother.

Florence M. had surgery to repair the wounds on her back, hand, forehead, and eyebrow. She spent eight days recovering in the hospital.

Several days after the attack, a California Highway Patrol (CHP) officer stopped defendant for a traffic violation and arrested him for possession of a stolen vehicle. Defendant told the officer that he thought he killed his pregnant sister-in-law by stabbing her from the neck down to the stomach. He claimed that the assault occurred during an argument about her "coming on to him."

Defendant was arrested and ultimately pleaded no contest to attempted murder in exchange for dismissal of the remaining

charges. At the second penalty retrial, the prosecution presented evidence that defendant called Florence M. after his arrest and threatened to harm her if she testified against him.

Florence M. and Priestly visited defendant while he was receiving mental health treatment to regain competence to stand trial in an unrelated offense. Defendant did not apologize to Florence M. or ask about her baby, who had survived the attack and was a toddler at the time.

## B. Defense Evidence

The defense focused on five themes: lingering doubt regarding defendant's participation in the homicide; the effects of defendant's childhood and background on his behavior; the failure of the juvenile court system to help defendant during his youth; defendant's mental illness and abnormal brain activity; and defendant's positive adjustment to prison.

### 1. Lingering doubt

Defendant presented evidence to show that James Curry, one of defendant's coworkers at Sonoma State Hospital, was implicated in the Cavallo murder based on his connection to the Bohsei television that was allegedly taken from Cavallo's house. Defendant also presented evidence to suggest that Cavallo did not own a handgun at the time he was murdered.

Robert Ferroggiaro worked at Sonoma State Hospital in 1979 and knew both defendant and Curry. Ferroggiaro testified that defendant called him from jail to say that he had purchased a television from Curry and needed it delivered to his wife. Curry brought the television to Ferroggiaro at work, and Ferroggiaro delivered it to defendant's apartment a few hours before the parole search. Defendant's wife called Ferroggiaro after the search to tell him the television had been seized. She

told Ferroggiaro that she did not reveal his connection to the television because she did not want him to get in trouble. Ferroggiaro contacted law enforcement to explain his involvement in case his fingerprints were on the television. He acknowledged on cross-examination that he remained friends with defendant, and that he had told police officers defendant was "as sane as anyone."

Gerald Gourley, a former Federal Cartridge Company employee and consultant on ammunition and guns, testified about the process of marking cartridges with a tool called a bunter. He explained that bunters were made by a tool called a hob. Gourley further explained that after cartridges are stamped with the bunter, they are commingled and packed into boxes. He believed that it was possible to determine whether two cartridges were struck by a bunter created by the same hob, and opined that several cartridges depicted in the prosecution's exhibits appeared to be struck by a bunter created by the same hob.

Cavallo's ex-wife testified that Cavallo had purchased a .22-caliber revolver, not a semiautomatic handgun, to practice target shooting with her in the late 1950s. She did not know whether he kept the revolver after they divorced, or if he had purchased additional firearms.

### 2. Family history

Psychologist Addison Somerville testified as an expert witness concerning the structure, makeup, and migration histories of African-American families, and regarding the influence of family on individuals. He interviewed defendant and three of his 10 siblings to assess certain variables that are crucial for normal development.

Dr. Somerville testified that defendant was born in Canton, Mississippi, but moved at age two with his family to Detroit, Michigan to live with McClenton, the oldest of his siblings. Defendant showed physical signs of malnutrition between the ages of three and four, but his family did not recognize the problem. Their stepmother was often gone for long periods of time, and left defendant and his siblings with minimal food. McClenton physically punished defendant by stripping him, beating him with a belt, slapping him, and bouncing his head on the floor.

Defendant did not know his father. Dr. Somerville opined that the lack of parental bonding created emotional deprivation, anxiety, and feelings of rejection. By age six, defendant was stealing food and hiding it in the basement. He used a collection container for a disabilities charity to collect money, which he kept to buy food for his family. At ages eight and nine, defendant often missed school because he was working odd jobs to help take care of his sisters. Defendant and his siblings frequently had only biscuits to eat and were told to drink a lot of water. Dr. Somerville opined that lack of food and consistent interactions at school had a tremendous impact on defendant's social development. Defendant had his first sexual encounter at age eight and had engaged in casual relations since then. He started smoking marijuana at age 10 and started using alcohol around the same time. Defendant's sister, Mary Lee, took in defendant and his siblings but struggled to support them financially. One of the sisters resorted to prostitution to secure money for food.

Dr. Somerville concluded that defendant's "early life centered around survival, and he seems to have developed a total lifestyle which is characterized by self-concern." He opined

11

that defendant was required to learn a variety of defenses which enabled him to experience minimal guilt or remorse, and that he lacked the confidence to attempt to change his behavior or attitudes. Defendant acted in an impulsive and unpredictable manner, denied his behavior when confronted, and was unable to form close relationships or trust people. Dr. Somerville explained that social, cultural, psychological, and economic factors all contributed to defendant's criminal behavior and believed that defendant needed to be confined to protect society.

Dwayne Martin testified about defendant's time at Ypsilanti State Hospital (YSH), a psychiatric facility, in the early 1960s. Defendant entered YSH in 1961 when he was 12 years old. Martin was defendant's teacher at the hospital. Martin explained that the children who came to YSH tended to be either juvenile delinquents, autistic, or suffering from a psychotic disorder. Martin opined that defendant fell somewhere between borderline psychotic and juvenile delinquent. He did not know whether YSH's psychiatrist medicated defendant. Defendant was treated for syphilis upon arrival at YSH, though Martin did not know how he acquired the disease.

Martin testified that defendant did well at YSH. Defendant joined the Boy Scouts, took on a leadership role, and volunteered to help whenever he could. He was respected by his peers, treated the staff warmly, and became less aggressive during his stay. The prosecution read prior testimony from another YSH teacher, Margaret Yates, who observed that defendant was motivated and worked hard. He seemed interested in learning new things and his academic performance improved. His social interaction also improved, and he took an interest in caring for the classroom hamsters and goldfish.

Sometime after he left YSH, defendant was committed to the Wayne County Youth Home, a juvenile detention facility in Detroit. Kenneth Peterson, the chief social worker at the home, testified that defendant had been committed to the state hospital the previous summer, but faced lengthy delays in getting transferred. Peterson read from a letter he had sent to the chief social worker at the hospital, in which he described defendant as having "constant agitating and irritating behavior[s]" and being hyperactive, expressing paranoid thinking, and being involved in delinquent behaviors. Peterson acknowledged that he had never personally worked with defendant; rather, he relied on reports from other people when writing the letter. A psychiatrist who worked with the youth home also testified that the waiting list for children to receive mental health treatment was very long and that Caucasian children were admitted at a higher frequency than African-American children.

When defendant was 16 years old, he was committed to the Indiana State Reformatory (the Reformatory) for car theft. He was initially housed in a minimum security dormitory outside the institution. He escaped just over two weeks later and was captured within a day. Defendant was subsequently transferred to Indiana State Prison after multiple additional disciplinary reports, including for having a knife in his cell, assaulting an officer, shouting and yelling on the range, refusing a direct order, creating a disturbance, and using threatening and provoking language toward an official. He was released from the prison in 1971.

A correctional counselor at the Reformatory testified, describing the institution as a "walled, maximum security prison." It housed individuals ranging from 16 to 60 years old

who were incarcerated for a variety of felony offenses, including murder. Discipline for a minor offense sometimes involved standing barefoot on a painted line for hours. Discipline for more serious offenses could mean receiving a beating from staff and then being taken directly to the hospital because they "needed medical attention by the time they got there."

### 3. *Evidence of mental disease or defect*

Six psychiatrists and neurologists, each of whom had evaluated defendant at various times in his life, testified at the second penalty phase retrial.

In June 1974, Patton State Hospital (PSH) psychiatrist James Ramsaran prepared a report concerning defendant's competence to stand trial for forcible assault upon Laughlin. After briefly interviewing defendant, Dr. Ramsaran concluded that defendant suffered from paranoid schizophrenia based on self-reported auditory hallucinations. Dr. Ramsaran opined that defendant did not fully understand the charges against him and could not assist in his defense. Defendant was not particularly cooperative or forthcoming during the interview, and Dr. Ramsaran did not have access to any previous records.

James Kerns, another psychiatrist at PSH, evaluated defendant for admission in July 1974. He diagnosed defendant with paranoid schizophrenia. Dr. Kerns did not know whether defendant received antipsychotic medication prior to his admission, but noted that he received medication for about two months after his admission.

Psychiatrist and neurologist Richard Finner evaluated defendant at PSH a few days after Dr. Kerns. Dr. Finner agreed that defendant suffered from schizophrenia, but opined that it

presented as undifferentiated rather than paranoid, meaning it presented as several forms of the disorder. Dr. Finner acknowledged while testifying that his diagnosis could have been different if he had had more information at the time of his evaluation.

Psychologist Grant Hutchinson testified that he had evaluated defendant in 1980 for evidence of brain injury and to assess personality and emotional function. Dr. Hutchinson found defendant to be of average intelligence with normal memory function. He also found no evidence of brain injury, despite several incidents of head trauma that defendant described. He did, however, find an atypical personality profile. The results of the Minnesota Multiphasic Personality Inventory revealed that defendant scored high on the scales of schizophrenia, mania, and paranoia. Dr. Hutchinson opined that defendant might suffer from paranoid schizophrenia in a chronic, residual phase, meaning it was inactive at the time of the evaluation. He explained that stress or going off medication can cause a person's schizophrenia to become active.

Neurologist Sidney Kurn evaluated defendant before the second penalty phase retrial. Dr. Kurn's neurological evaluation revealed mild abnormalities: defendant did not feel sensation, such as a pin prick, on the right side of his body as well as he did on the left side, and reflexes were mildly depressed in his legs. Dr. Kurn performed a standard electroencephalogram (EEG), the results of which appeared normal. A magnetic resonance imaging (MRI) test revealed abnormalities in defendant's basal ganglia, an area of the brain connected with movement and planning motor activity. A second abnormality appeared in the pons area of the brain, which is also connected to motor function. Dr. Kurn performed

a computerized EEG, which analyzes brain activity in a more advanced manner than a standard EEG. The computerized EEG showed unusually high alpha brain-wave activity in defendant's frontal lobes, which control decision making, motivation, and judgment. Dr. Kurn explained that this pattern of brain-wave activity is typically found in the back of the brain. The computerized EEG also revealed an unusually slow response to auditory stimulation. The delayed response could be the result of epilepsy, damage to the brain, or dysfunction in the neurotransmitters in the brain. Dr. Kurn explained that the abnormalities he found suggest that defendant's nervous system does not work properly, and therefore functions such as judgment, foresight, and self-control are probably impaired. On cross-examination, Dr. Kurn acknowledged that another neurologist performed a similar evaluation — but not an MRI or computerized EEG — on defendant in 1980 and found no evidence of neurological impairment or disorder.

Neuropsychologist Robert Bittle testified as an expert on brain disease and dysfunction. Dr. Bittle did not meet defendant personally but reviewed several of his psychological and neurological reports. Dr. Bittle agreed that the MRI revealed structural abnormalities in defendant's basal ganglia and pons regions, likely due to trauma. He opined that people with abnormal brain activity in the frontal lobes tend to be hyperactive, emotionally overresponsive, and have low stress tolerance. He concluded that defendant suffered from antisocial personality disorder and paranoid schizophrenia.

### 4. *Behavior in custody*

Jerry Enomoto, a previous director of the former California Department of Corrections (CDC), testified as an

expert concerning corrections and inmate management. Enomoto reviewed defendant's CDC file from 1979 through the time of trial and found only two disciplinary reports. He believed that defendant had learned to conform to what was expected of him in prison.

## C. Rebuttal Evidence

### 1. Lingering doubt

Because Curry was unavailable as a witness, the prosecution read his prior trial testimony to the jury. Curry had testified that he and defendant worked together at Sonoma State Hospital in 1978 and 1979. At the end of July 1979, defendant asked Curry to hold a television for him. Curry agreed and took the television to his girlfriend's house. Curry identified People's Exhibit 48, a small Bohsei television set, as being "similar" to the one he held for defendant. Defendant later asked Curry to return the television, and had Ferroggiaro retrieve the television from Curry. Defendant's wife also called Curry and asked him to return the television. Curry denied selling the television to defendant.

### 2. Evidence of mental disease or defect

Psychiatrist Ronald Byledbal evaluated defendant in July 1979 to determine his competency to stand trial on pending charges for assaulting Verna O. Defendant explained that he remembered using cocaine and drinking before he argued with Verna O., but did not recall stabbing her. Defendant told Dr. Byledbal that if he had stabbed Verna O., he would have "done a better job" by getting rid of the weapon and leaving town.

Dr. Byledbal reviewed defendant's juvenile records, several psychological and neurological reports, and transcripts of prior testimony in preparation for his testimony in the trial.

He concluded that defendant was not a paranoid schizophrenic but did suffer from antisocial personality disorder. Dr. Byledbal testified that it was his view that the two PSH doctors who diagnosed defendant with paranoid schizophrenia were incorrect because they had no knowledge of defendant's prior history. Dr. Byledbal opined that a doctor cannot make an accurate diagnosis of some patients without knowing any background information from a source other than the person, and explained that it is easy to "play paranoid schizophrenic very well" and fool an evaluator.

Dr. Byledbal testified that defendant's history was typical of antisocial personality disorder, the common characteristics of which are hyperactivity, attempting to manipulate and control people, lying, and refusing to accept responsibility while blaming others. He stated that a person with antisocial personality disorder may have aggressive tendencies, but not all antisocial people are aggressive. He explained that people with antisocial personality disorder can become psychotic under the influence of drugs or alcohol, but he did not believe that was the case with defendant.

Psychiatrist Donald Apostle also evaluated defendant in July 1979 to determine his competency to stand trial on pending charges for assaulting Verna O. Before interviewing defendant, Dr. Apostle reviewed the sheriff's report of the incident, Verna O.'s hospital records, and CDC records. Defendant told Dr. Apostle that he had no memory of the incident and that "there is no way that he could have stabbed this particular woman." Defendant described two prior incidents in which he had "blacked out," including one at PSH and one at home with his wife.

Defendant recounted to Dr. Apostle a similar account of the history described earlier: He moved to Detroit at age two, was raised by a stepmother and believed his own parents to be dead, and that he had an older stepbrother and younger stepsister. He had problems in school and stole things to help support his stepmother. He was sent to a state hospital in Michigan at age 10 for armed theft, where he stayed until age 13. He was in and out of juvenile hall until he stole a car and drove from Michigan to Indiana, where he was arrested and incarcerated until 1971. Upon release, he was paroled to the custody of his brother in California, after which he attacked Florence M. During the interview, defendant told Dr. Apostle, "I will be honest with you, Donald, I learned how to get around in prison. I learned how to be a sociopath." Defendant also said that he would "never admit this present offense," because, he asserted to Dr. Apostle, it was the first time he had "ever fought a case because he just didn't remember doing it."

After reviewing defendant's neurological and psychiatric reports, as well as his juvenile court records, Dr. Apostle opined that defendant did not suffer from paranoid schizophrenia or any other mental illness. He agreed that defendant suffered from antisocial personality disorder based on defendant's long history of criminal behavior, childhood acting out, lack of taking responsibility for his actions, belittling of Verna O., and the claim that he learned how to be a sociopath in prison.

## II. PENALTY PHASE ISSUES

### A. Denial of *Faretta* Motion

Defendant contends the trial court committed reversible error when it denied his request for self-representation under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*), made two

weeks prior to the scheduled trial date. We conclude the trial court properly denied defendant's motion as untimely.

### 1. Procedural history

Defendant's first penalty phase retrial ended in a mistrial on February 11, 1991. Four days later, defendant's attorney, Sonoma County Deputy Public Defender Elliot Daum, declared a conflict. Daum expressed uncertainty whether the entire office had a conflict and asked that the matter be continued. The trial court found a conflict as to Daum, but not concerning the entire public defender's office.

In May 1991, the matter was transferred back to Sacramento County Superior Court for trial, which was initially set for September but was later rescheduled for November. At a hearing in August 1991, the court was informed that Deputy Public Defender Charles Ogulnik had been assigned as defendant's counsel, and that Donald Masuda, a local attorney who had done some work on the first penalty phase retrial, was appointed as *Keenan* counsel. (*Keenan v. Superior Court* (1982) 31 Cal.3d 424, 428.) In mid-November, defense counsel sought and obtained a continuance of the trial date to June 22, 1992.

On June 8, 1992, two weeks before trial was scheduled to commence, defendant filed[2] several written motions in propria persona: to proceed in propia persona under *Faretta*, to substitute counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, for a continuance, and for discovery of documents in

---

[2] Defendant had one week earlier sent these motions to Masuda, asking him to file the pleadings for him because Masuda was "close to the court and [i]t would take [defendant] at least two weeks to get them certified and then mailed to the court."

a California State Bar disciplinary proceeding relating to Ogulnik. The motion for a continuance stated that "[d]efendant has removed counsel of record and needs considerable time to rev[ie]w documents, investigate possible defense strateg[ie]s, interv[ie]w attorneys for advisory counsel pos[i]tion, as well as others that will [be] part of the defense team[,]" and "[t]o deal with any and all matters p[er]taining to putting forth a creditable [sic] defense." The motion also stated that "defendant will require a substan[ti]al amount of time to rev[ie]w documents to determine what creditable [sic] defense could be fastened from it."

The prosecution opposed defendant's *Faretta* motion, arguing it was untimely. The prosecution also opposed the motion to continue.

At a pretrial hearing on June 12, trial counsel indicated that they were ready to proceed with trial as scheduled. On June 22, a trial judge was assigned to the case, and the parties agreed to wait to argue defendant's motions until they were before the assigned judge. On July 6, the assigned trial judge heard defendant's *Marsden* motion in camera, which also included discussion relevant to the *Faretta* motion. Defendant explained that Ogulnik had promised not to contact family members without his permission, but did so anyway and then lied to him about it. He also felt there were better defense strategies than the "sympathy" defense Ogulnik had planned, and instead preferred to attack the guilt phase evidence. Defendant agreed that Ogulnik had recently put a great deal of effort into investigating the guilt phase evidence. He said that he and Ogulnik had a personality conflict at the time he filed the motion, but the conflict had since been

resolved. Nonetheless, he asserted, he still wanted to represent himself.

The court resumed the *Marsden* hearing the following day. The court asked defendant to explain his statements that he had not been permitted to assist in his defense, and had not been provided with copies of materials that the defense had obtained or gathered. Defendant replied that he believed the defense evidence to date was "not as solid" as the prosecution's, and that "certain investigations or certain research" was either not being done or was being done late in the process. Defendant acknowledged his defense team's investigative efforts had increased substantially since the motion had been filed and a little before then, too, but he believed the investigation "should have been done several months earlier." He also acknowledged that his attorneys were keeping him better informed than they had previously been.

Ogulnik explained that there might have been an "innocent misunderstanding on [his] part" as to whether he had defendant's permission to contact family members. Ogulnik knew that defendant had expressed to his previous counsel similar concerns regarding contacting family, but Ogulnik believed that he and defendant had resolved that with a meeting "early on" in the representation. Ogulnik's investigator, Gary Dixon, shared Ogulnik's understanding of the situation. When the court asked Ogulnik about defendant's claim that the team got a late start with the investigation, he explained that given the age of the case and the prior reversals, the team decided to reinvestigate and "take nothing for granted." Ogulnik explained that locating witnesses took a long time, and he understood why, to defendant, it appeared that they did not investigate matters such as lingering doubt, bias, or prejudice. He also explained

that he was obligated under the law to investigate the possibility of a "psych defense," but defendant found it to be unnecessary and strongly objected.

Defendant told the court, "I know that right now what I know is to be the best defense for me, and what is not going to work is my major concern.  I discussed it with Mr. Ogulnik.  He wants to go this way.  I want to go this way.  He wants to investigate this.  I don't think it's worth anything. . . .  It's my life, see. . . .  It's my decision as to how my life should be presented to this Court or to a jury, see.  Because all good intentions, I know he probably feel bad if I die, but badness ain't going to save me."  He acknowledged that tactical disagreements as to how the case should be tried served as the basis for his motion.  The court denied defendant's *Marsden* motion.

The court addressed defendant's *Faretta* motion in open court on July 9, one month after defendant had filed it.  The court noted defendant's simultaneous request for a continuance and asked how much time he would need to prepare for trial.  Defendant responded that it would be premature for him to give a specific time period.  Masuda suggested that defendant would need about a year to prepare, and the court agreed that "many months at the minimum would be required" for defendant to prepare to represent himself.  The court expressed concern about the timeliness of the motion and requested the district attorney leave the room so it could continue the hearing in camera.

The court asked defendant if he had considered filing a *Marsden* or *Faretta* motion prior to doing so in early June.  Defendant explained that he had considered such filings the previous September, but decided not to do so because he and his

attorneys had resolved their differences and "worked out a foundation from which we would confer and how we would from that point investigate and search out new avenues of approach to the case." He further explained that his previous appellate attorney knew he was having problems with Ogulnik and Dixon but encouraged him to "sit back and be a lot more patient, and see how things develop" with the investigation and communications.

Defendant explained that he again considered filing a *Faretta* motion in January or February 1992, but Masuda and Sonoma County Public Defender Marteen Miller had encouraged him to be patient and wait a few months to see if matters improved. Defendant stated that "nothing [has] changed to the point I felt that I would be comfortable, and I still felt best that I could represent myself, so I filed it. That was the reason for the delay both times. It was good advice from good attorneys, and I waited." He continued, "The only reason I delayed . . . was as a result of people asking me because they felt that I was being somewhat over judgmental as to Mr. Ogulnik and everybody else involved in [the] case."

The court stated that it needed more time to review relevant law and continued the hearing until mid-July. The court held another in camera hearing to ask defendant more questions regarding both his *Marsden* and *Faretta* motions. In his *Faretta* motion, defendant had alleged that counsel refused his request to investigate "issues of grave importance" and "wasted over five months of valuable time before starting any investigation into any matter of concern to him." The court asked defendant to elaborate on his allegations. Defendant explained that another person had a gun similar to the one found at the church a few days after the incident, and he

believed that person's gun could have been the weapon used to assault Mary S. His previous attorneys did not undertake such an investigation. He asked Ogulnik and Dixon to review the matter; they completed the investigation three weeks prior, although "to a degree unsatisfactory" to defendant. He also requested DNA analysis be done on the blood found on the gun located at the church, but was told "it was too little to do a special analysis." He additionally believed that counsel could have worked harder to locate witnesses. Defendant acknowledged that he and his attorneys had different viewpoints concerning what was important to investigate, but he believed that Ogulnik had agreed to also focus on what was important to defendant. The court reaffirmed its denial of the *Marsden* motion but did not decide the *Faretta* motion.

On July 21, 1992, the court denied defendant's *Faretta* motion as untimely. The court acknowledged that most case law involving untimely *Faretta* motions involved motions made the night before or the day of trial, but cited *People v. Ruiz* (1983) 142 Cal.App.3d 780 as involving an untimely motion made six days before trial. The court explained that when assessing timeliness, it needed to consider the periods of time preceding the trial during which defendant had the opportunity or ability to evaluate his dissatisfaction with counsel. The court noted that Ogulnik had represented defendant since July 1991 and found "no persuasive reason why" defendant had not moved "substantially earlier in the proceedings" to represent himself. The court further noted that defendant's complaints against Ogulnik were "in many rather striking ways similar to the objections he had against the earlier attorney, Mr. Daum." Given that defendant could have filed the motions sooner, the court stated that "the strong suspicion arises that the whole

process, at least, has an element in it of interrupting the orderly processes and bringing about delays." It also reiterated "that a substantially significant time period would be required" for defendant to prepare for trial, resulting in a disruption of trial for an extended period. The trial court found, therefore, that the *Faretta* motion was untimely.

The court went on to decide whether to exercise its discretion to grant defendant's untimely motion using the factors set forth in *People v. Windham* (1977) 19 Cal.3d 121, 127 (*Windham*) (trial court has discretion to grant or deny untimely *Faretta* motion based on quality of counsel's representation, defendant's prior proclivity to attempt to substitute counsel, reasons for defendant's request, anticipated length and stage of proceedings, and disruption and delay that might reasonably be expected to follow granting *Faretta* motion). The court observed that Ogulnik and Masuda were qualified and experienced attorneys, and that their representation of defendant was "satisfactory and of good quality." It noted that defendant had a prior history of substituting counsel; he had filed *Marsden* motions against Daum in January and April 1991. The court reiterated that it found defendant's reasons for his prior *Marsden* motions to be unpersuasive and his criticisms of counsel unjustified. Based on these factors, the court declined to grant the untimely motion.

Regarding the length and stage of proceedings, the court stated that preparation for the case, involving reviewing transcripts of two trials and voluminous police reports, would take a long time. It stated: "So, it's a lengthy proceeding, and here we are on the eve of trial with a motion to first replace counsel and then to represent himself, with no persuasive explanation given for this delayed filing. As I mention, many of

26

the matters complained of have pre-existed." The court noted that the issues between defendant and counsel had existed over a period of months and were "not new events that might explain why someone has felt the need to make this motion as to what amounts to about the eleventh hour." Finally, the court noted that the disruption and delay that might reasonably be expected to follow would be "considerable" and "certainly would interrupt any kind of orderly litigation of this case." It acknowledged that defendant was not responsible for the ten-year hiatus while the case was on appeal, but stated that nonetheless "this case is vulnerable in the sense that years are passing affecting the availability of witnesses and the recall of witnesses and if this case has to go off and start over again for the defendant to prepare himself, the delay and the loss of witnesses could well continue. So, the People run the risks of being significantly prejudiced if this case is continued for a significant period of time."

After additional comments from defendant, the court asked Masuda to address on the record defendant's allegations that he delayed filing a *Faretta* waiver because Masuda had asked him to wait. During an in camera hearing, Masuda explained that defendant wrote him a series of letters expressing concern about Ogulnik's representation. Masuda encouraged defendant to wait because every attorney prepares for trial differently "and so he shouldn't be judgmental. He should wait and see to see what kind of results would come up and see what efforts were being done." Masuda said he made "sincere efforts" to calm defendant down and assure him that "everything was being done that should have been done." He agreed that defendant's relationship with Ogulnik had had its

ups and downs, but believed it was better than defendant's relationship with his previous attorney, Daum.

Defendant explained that in April he and Ogulnik had "hit a snag that wasn't going to be moved because he had his way of wanting to do it. I had my way of feeling how I think it should be done, and we couldn't get along." Defendant had written a letter to Public Defender Miller expressing his dissatisfaction, and Miller encouraged defendant to wait so that Miller could try to "work it out." Masuda and defendant agreed that they never had a conflict between themselves.

Voir dire commenced on July 28. Shortly after jury selection began, the court acknowledged that it had received additional documentation related to defendant's *Faretta* motion, including correspondence regarding a State Bar disciplinary proceeding involving Ogulnik. The court stated, "I do notice, though, that this is an issue you did not really raise when you made your [p]ro [p]er motion, that his problems with the State Bar affected his competence to represent you in this case. Is that — am I correct in that observation or am — I want to give you an opportunity to comment on what struck me." Defendant replied, "I have no further comment about it. It was simply to assert to the [c]ourt. There is no comment needed." The court stated that the documents did not cause it to reconsider its denial of defendant's untimely *Faretta* motion.

### 2. *Analysis*

In *Faretta*, the United States Supreme Court made clear that a criminal defendant has a federal constitutional right to represent himself if he voluntarily and intelligently so chooses. (*Faretta, supra*, 422 U.S. at pp. 835-836.) A trial court must grant a defendant's request for self-representation if the request

is timely and unequivocal, and the defendant makes his request voluntarily, knowingly, and intelligently. (*Windham*, *supra*, 19 Cal.3d at pp. 127-128.) If a self-representation motion is untimely, however, it is "within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed *pro se*." (*Id.* at p. 124.)

We have long held that a *Faretta* motion is timely if it is made "within a reasonable time prior to the commencement of trial." (*Windham*, *supra*, 19 Cal.3d at p. 128.) In *Windham*, we explained that the "reasonable time" requirement "must not be used as a means of limiting a defendant's *constitutional* right of self-representation," but rather to prevent the defendant from "misus[ing] the *Faretta* mandate as a means to unjustifiably delay a scheduled trial or to obstruct the orderly administration of justice." (*Id.* at p. 128, fn. 5.) The high court has acknowledged that most lower courts require a defendant to make a self-representation motion "in a timely manner," which reflects that "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." (*Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.* (2000) 528 U.S. 152, 162.)

"[W]e have held on numerous occasions that *Faretta* motions made on the eve of trial are untimely." (*People v. Lynch* (2010) 50 Cal.4th 693, 722 (*Lynch*), abrogated on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610; *id.* at pp. 722-723, citing *People v. Frierson* (1991) 53 Cal.3d 730, 742 [*Faretta* motion made two days before trial was made "on the eve of trial" and was untimely], *People v. Valdez* (2004) 32 Cal.4th 73, 102 [*Faretta* motion made "moments before jury selection was set to begin" deemed untimely], *People v. Horton* (1995) 11 Cal.4th 1068, 1110 [*Faretta* motion made on the date scheduled for trial

deemed untimely], and *People v. Clark* (1992) 3 Cal.4th 41, 99-100 [*Faretta* motion made several days after case had been continued day to day "in the expectation that the motions would be concluded and jury selection set to begin at any time," deemed "in effect the eve of trial" and untimely].) We have also held that *Faretta* motions made long before trial are timely. (*Lynch*, at p. 723, citing *People v. Halvorsen* (2007) 42 Cal.4th 379, 434 [*Faretta* motion made seven months before penalty retrial jury selection commenced was timely]; *People v. Stanley* (2006) 39 Cal.4th 913, 932 [*Faretta* motion made one year before the preliminary hearing and nearly two years before trial was timely].) "[O]ur refusal to identify a single point in time at which a self-representation motion filed before trial is untimely indicates that outside these two extreme time periods, pertinent considerations may extend beyond a mere counting of the days between the motion and the scheduled trial date." (*Lynch*, at p. 723.)

In *Lynch*, we pointed out that "in the related context of the Sixth Amendment right to select counsel of one's choice, which is also subject to automatic reversal if erroneously denied, the high court has 'recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness [citation], and against the demands of its calendar.' " (*Lynch, supra*, 50 Cal.4th at p. 725, citing *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 152.) We observed that "a trial court may 'make scheduling and other decisions that effectively exclude a defendant's first choice of counsel' " (*Lynch*, at p. 725, citing *Gonzalez-Lopez*, at p. 152), and "perceive[d] no principled basis on which to deny a trial court the opportunity to similarly consider the needs of fairness and the demands of its calendar in ruling on a request for *self*-representation, or to

accord the defendant seeking self-representation any greater liberty to do so than the defendant seeking to select retained counsel." (*Lynch*, at p. 725.)

Relying on the federal high court's cases as well as our own, we concluded that a trial court may consider the totality of the circumstances in determining whether a defendant's pretrial *Faretta* motion is timely. (*Lynch, supra*, 50 Cal.4th at p. 726.) We held that a trial court may properly consider "not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation." (*Ibid.*)

In *Lynch*, the trial court denied as untimely defendant's two *Faretta* motions, the first filed approximately five weeks before trial was scheduled to begin,[3] the second motion three weeks later. (*Lynch, supra*, 50 Cal.4th at p. 714.) Based upon the totality of the circumstances, we concluded that the trial court's denial of the defendant's *Faretta* motions was proper. (*Id.* at p. 726.) We observed that this was a complicated case involving three counts of murder and two counts of attempted murder, each involving a separate incident and carrying with it a possible death sentence. (*Ibid.*) We also noted that discovery was voluminous, and trial preparation complex. (*Ibid.*) The prosecution anticipated calling at least 65 witnesses at the guilt

---

[3] Pretrial motions ultimately commenced eleven days after the scheduled trial date in *Lynch*. (*Lynch, supra*, 50 Cal.4th at p. 721.)

phase, many of whom were elderly. (*Id.* at pp. 726-727.) We also pointed out that at the time of the *Faretta* hearing, held approximately two weeks from the expected start date of pretrial motions, defense counsel had indicated that they were ready for trial. (*Ibid.*) We remarked that the case, which had endured significant delay, was finally nearing resolution, and that the defendant admitted that he would need additional time to investigate and prepare his case and could not estimate how much additional time he would require until he reviewed the discovery and other materials. (*Id.* at pp. 727-728.)

We did not articulate in *Lynch* what standard a reviewing court should apply in determining whether a defendant's request for self-representation is timely. Defendant urges us to apply de novo review in deciding whether his *Faretta* motion was timely filed. We need not decide whether de novo review or a more deferential standard is appropriate, however, because defendant's claim fails under either standard.

Based on our independent review of the record and after taking into consideration the totality of the circumstances under *Lynch*, we conclude the trial court properly denied defendant's *Faretta* motion as untimely. As noted above, defendant filed his *Faretta* motion two weeks before the scheduled trial date. Defendant indicated in his accompanying motion for a continuance that he would "need[] considerable time" to review documents, investigate possible defense strategies, and prepare for trial. Defense counsel estimated defendant would need a year to be trial ready and the court agreed that "many months at a minimum" would be necessary based on the record. Meanwhile, trial counsel advised the court on June 12 that they were ready to proceed with trial as scheduled.

Moreover, defendant had numerous opportunities to assert his right of self-representation earlier.[4] Ogulnik had been appointed approximately eleven months prior to defendant filing his *Faretta* motion. The trial court reasonably concluded it had a "strong suspicion," given the amount of time defendant and Ogulnik had worked together and the similarities in defendant's complaint against Ogulnik and his prior attorney, that defendant brought the *Faretta* motion with the purpose of interrupting the process and creating delay. (*People v. Marshall* (1997) 15 Cal.4th 1, 26 [*Faretta* motion may be denied based on evidence that defendant's purpose was to delay proceedings].)

In addition, because the case had been on appeal and the first penalty retrial had ended in a mistrial, more than 13 years had elapsed between the crimes against Cavallo and the second penalty phrase retrial. The second penalty retrial, which carried a possible death sentence, was inherently complex, involving evidence of the circumstances of the charged offenses as well as two uncharged acts of violence and four separate prior felony convictions. The prosecution anticipated calling 20 witnesses and observed that several were no longer available. As the trial court noted, the availability of witnesses, as well as witness recall, had declined and would continue to do so should there be additional delay. Although the lengthy delay in this case cannot be attributed to defendant, "he did not thereby

---

[4] Although defendant seems to imply that his decision to represent himself was based, in part, on his discovery of the State Bar disciplinary proceeding against Ogulnik, defendant did not include this information in his *Faretta* motion or raise it during the hearings on the motion, and, as observed earlier, he declined the court's invitation to elaborate on why he failed to do so.

escape any responsibility for timely invoking his right to self-representation." (*Lynch*, *supra*, 50 Cal.4th at p. 727.)

Defendant asserts that most federal courts have concluded that a *Faretta* motion is timely as a matter of law if it is made before trial, unless the motion is made for the purpose of delay. (See, e.g., *Fritz v. Spalding* (9th Cir. 1982) 682 F.2d 782, 784; *U.S. v. Lawrence* (4th Cir. 1979) 605 F.2d 1321, 1325; *Chapman v. U.S.* (5th Cir. 1977) 553 F.2d 886, 894.) Although we recognize that some federal appellate decisions have adopted a different approach, we see no compelling reason to reconsider the standard set forth in *Lynch* at this time. Indeed, in *Lynch* we considered and rejected the idea of a bright-line rule, explaining that "nothing in *Faretta* or its progeny either expressly or implicitly precludes consideration of factors other than the number of weeks between the self-representation motion and the trial in determining timeliness . . . ." (*Lynch*, *supra*, 50 Cal.4th at p. 725.) We further note that sister states have also adopted a timeliness test consistent with *Lynch*. (See, e.g., *Lyons v. State* (Nev. 1990) 796 P.2d 210, 214 [if *Faretta* request can be granted without need for a continuance, request should be granted; otherwise, request may be denied as untimely if there is no reasonable cause to justify the late request]; *Guerrina v. State* (Nev. 2018) 419 P.3d 705, 709, quoting *Lynch*, *supra*, 50 Cal.4th at p. 724 [*Faretta* " 'nowhere announced a rigid formula for determining timeliness without regard to the circumstances of the particular case' "].)

We therefore conclude the trial court did not err when it determined that defendant's *Faretta* motion was untimely and denied it on that basis.

### B. *Batson/Wheeler* Motion

Defendant contends the trial court erred when it found he had not established a prima facie case of discrimination after the prosecutor used three of his first 15 peremptory challenges to strike three of the five African-American jurors who had been seated. (See *Batson v. Kentucky* (1986) 476 U.S. 79, 89 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 (*Wheeler*).) We conclude there was no error.

### 1. *Procedural background*

Before conducting individual voir dire, the trial court instructed all prospective jurors to complete an eleven-page written questionnaire and, if applicable, a hardship form. Following hardship excusals, prospective jurors returned for individual questioning over the course of several days.

Prior to preliminary voir dire of prospective juror Kenneth M., who was African-American, the prosecutor revealed that he had run a computer criminal history check "on some of the jurors" and discovered that Kenneth M. had two misdemeanor convictions. The prosecutor observed that Kenneth M. had checked "no" on his jury questionnaire in response to the question asking if he had ever been accused of or arrested for a crime. The prosecutor requested the court to examine the juror for misconduct and dismiss him for lying. Defense counsel relayed that he had previously asked the prosecutor if he had checked all the jurors, and the prosecutor had said no. Defense counsel wondered whether the prosecutor had run a criminal record check on only African-American prospective jurors. The prosecutor responded, "I don't think I am obliged to answer that inquiry." Defense counsel said, "I am just kind of curious why he would run a check on Kenneth [M.] when his questionnaire,

itself, doesn't indicate that he would be lying or lead one to suspect that maybe he's misinforming the Court or us with respect to his background. I just find it very curious."

The court agreed that it could not compel the prosecutor to explain his reasoning, but stated that the prosecutor's state of mind would be relevant if a *Batson*/*Wheeler* challenge arose later. When defense counsel explained that the defense did not have access to the computer data that the prosecutor had, the prosecutor replied that he would be happy to check on anybody the defense might request. Defense counsel replied, "[Y]our Honor, our request would be that we just have the information as to all the jurors that [the prosecutor] ran . . . and the information that he obtained." The prosecutor explained that he did not have time to check on every juror, but rather, was "going to check certain jurors when they spark [his] interest." He reiterated that if a juror sparked the defense's interest, he would run a check on the requested juror.

Defense counsel stated that "a *Wheeler* motion is always something that could occur in any case of this nature, and I think we should always be aware of what's going on and what's happening with respect to any potential *Wheeler* motion that may be made, and I don't see why [the prosecutor] would object to informing us as to which jurors he ran a check on so that we have the same information with respect to those jurors." The prosecutor responded that "a *Wheeler* motion requires that there be made some kind of prima facie case. That's why, frankly, for the record, I am objecting to disclosing why I checked certain jurors and which ones I checked because they have to make a prima facie case. The fact that I checked one and found a record doesn't make a prima facie case." The trial court agreed with

the prosecutor, stating, "That's what I perceive also, and that's why I haven't agreed to order such disclosure." It ultimately directed the prosecutor to disclose "any juror that he ran and in running gained some information that has not been clearly disclosed by that juror in the questionnaire or here in court." It also permitted defense counsel to submit particular names in a sealed envelope for background checks. After both sides questioned Kenneth M., the prosecutor withdrew his request to dismiss him from the jury for misconduct and both sides passed for cause.

Jury selection began the following afternoon. The jury pool consisted of 56 people, seven of whom identified themselves on the jury questionnaire as African-American or Black, the same race as defendant.

After the prosecutor exercised his initial peremptory strike, the first African-American juror, Danella D., was seated. The prosecutor exercised three peremptory challenges and then passed. The defense exercised two challenges, and the prosecutor struck another juror. After the defense used another peremptory challenge, the second African-American juror, Hazel D., was seated. The prosecution again accepted the panel as constituted. After each side exercised additional challenges, the third African-American juror, Lois G., was seated. Lois G. was absent from proceedings that day "by understanding and agreement," and still available for jury duty. The defense passed, and the prosecutor used his tenth peremptory challenge to strike Lois G. Defense counsel then raised a *Batson/Wheeler* motion. The court denied the motion, noting that the prosecutor had exercised one of its 10 peremptory challenges against an African-American juror, and two African-American jurors were still seated in the box.

Voir dire continued, and the prosecutor exercised two more peremptory challenges. The fourth African-American prospective juror, Sharon H., was seated. After the defense passed, the prosecutor exercised his thirteenth challenge to excuse Sharon H. The defense exercised another challenge and the prosecution passed. Both sides exercised additional challenges before Shanna H., the fifth African-American prospective juror was seated. The prosecutor used his fifteenth challenge to excuse Shanna H.

The defense made a second *Batson*/*Wheeler* motion, arguing that the prosecutor had excused three African-American jurors, each of whom had indicated on her questionnaires an ability to vote for the death penalty. The prosecutor acknowledged that he had excused three African-American jurors but argued that he "left two. I don't think that quite reaches a prima facie case yet." The court ultimately agreed, concluding, "I am not persuaded that three out of five with two remaining in the jury box being passed, that is a statistically anything event showing a pattern of intent to exclude or minimize" the presence of African-American jurors.

When voir dire resumed, each side exercised one more peremptory challenge and then passed. Before the court could swear in the panel, a prospective juror informed the court that she was "quite uncomfortable" with the responsibility of having to decide whether a person should live or die. After the court questioned the juror, the parties agreed to reopen jury selection and allow the prosecutor to exercise a peremptory challenge to strike the juror. The defense exercised four remaining peremptory challenges before Wayde B., the sixth African-American prospective juror on the panel, was seated. Both sides accepted the jury as constituted. At the close of regular jury

selection, 48 prospective jurors had appeared in the box. The prosecution had exercised 3 of 17 strikes on African-American jurors. Three of the 12 seated jurors were African-American.

The court then called three alternate jurors to be seated, including Kenneth M. The prosecutor used his second of three additional peremptory challenges to remove Kenneth M. The defense raised its third *Batson/Wheeler* motion, arguing that Kenneth M. was excluded on the basis of race and "based on the fact that the District Attorney used information available only to him to check the background on [Kenneth M.]" The trial court denied the motion. It stated that the prosecutor had "disclosed the information discovered prior to voir dire, so that adequate and thorough voir dire could be afforded to all sides," and found no fault in the prosecution "conducting his limited investigation of jurors and disclosing the outcome of it." The court also determined that the statistics did not support a prima facie case of discrimination.

At the close of alternate jury selection, 54 of the 56 prospective jurors had appeared in the box. The prosecution had exercised a total of 4 of 19 strikes on African-American jurors. The seated jury consisted of three African-American jurors, seven Caucasian jurors, one Hispanic juror, and one mixed-race juror.

### 2. *Analysis*

"Both the United States and California Constitutions prohibit discriminatory use of peremptory strikes." (*People v. Reed* (2018) 4 Cal.5th 989, 999 (*Reed*).) To assess whether such prohibited discrimination has occurred, our *Batson/Wheeler* inquiry follows three distinct steps. (*Ibid.*) "First, the defendant must make out a prima facie case 'by showing that the totality

of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted (*Johnson*).)

The trial court denied each of defendant's *Batson*/*Wheeler* motions at the first stage of the inquiry after ruling defendant failed to establish a prima facie case of discriminatory intent. Prior to *Johnson*, the California standard at this step "was to show that it was 'more likely than not' that purposeful discrimination had occurred." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1293.) However, in *Johnson*¸ the United States Supreme Court rejected that analysis as too stringent under the federal Constitution and held that "a prima facie burden is simply to 'produc[e] evidence sufficient to permit the trial judge to draw an inference' of discrimination." (*Ibid.*)

We review the trial court's ruling "independently where, as here, the trial predated *Johnson* and it is not clear from the record whether the trial court analyzed the *Batson/Wheeler* motion with this low threshold in mind." (*People v. Scott* (2015) 61 Cal.4th 363, 384.) We examine the entire record when conducting our review. (*Reed, supra,* 4 Cal.5th at p. 999.) Certain facts, however, are considered especially relevant. "These include whether a party has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that group, whether the

party has engaged those prospective jurors in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group to which a majority of remaining jurors belong. [Citation.] We may also consider nondiscriminatory reasons for the peremptory strike that 'necessarily dispel any inference of bias,' so long as those reasons are apparent from and clearly established in the record." (*Id.* at pp. 999-1000.)

Defendant challenges the court's denial of his second *Batson*/*Wheeler* motion. He asserts ample evidence supports a prima facie case. Defendant argues that at the time he made the second motion, the prosecutor had struck three of five African-American jurors and had established a pattern of striking an African-American juror whenever there were more than two on the panel. Defendant also asserts that the prosecutor appeared to conduct a criminal background check on only one potential juror: Kenneth M., an African-American. Defendant further notes that he is African-American and at least two of the victims (Cavallo and Mary S.) were Caucasian, and the struck African-American jurors all possessed traits the prosecution could have viewed favorably. We conclude, based on the entire record, that defendant has not shown that the totality of relevant facts creates an inference of discriminatory intent.

Defendant first contends the prosecutor's "strike rate" establishes a prima facie case of discrimination because he exercised a disproportionate number of peremptory challenges against African-American jurors. Defendant points out that at the time of the second *Batson/Wheeler* motion, the prosecutor had used 20 percent of his strikes on African-American jurors — 3 of 15 — despite the proportion of African-American jurors on the panel being 12 percent — 5 of 41. He further notes that the

prosecutor's excusal rate for African-American jurors was 60 percent — 3 of 5 — whereas his exclusion rate for the rest of the panel was 34 percent — 12 of 35.

Considered in the context of the entire jury selection process, the prosecutor's strikes do not support an inference of discrimination. (*Reed*, *supra*, 4 Cal.5th at p. 1000 [strikes made after the *Batson/Wheeler* challenge are considered in assessing discriminatory intent].) The prosecutor exercised 17 strikes during the selection of regular jurors, and two more while selecting alternates. Three of the prosecutor's 17 strikes during regular jury selection (18 percent) — and 4 of 19 overall (21 percent) — targeted African-American jurors. These figures "barely" exceed the 13 percent ratio (7 of 54) of African-American jurors in the venire, and do not by themselves suggest an inference of discrimination. (*Ibid.* [finding 46 percent strike rate of African-Americans compared to 34 percent of African-American jurors in the venire to be insignificant].)

Nor does the exclusion rate of African-American jurors support an inference of discriminatory purpose. At the close of regular jury selection, the prosecutor had struck 3 of 6 African-American jurors — an excusal rate of 50 percent — and had struck 14 of 42 non-African-American jurors — an excusal rate of 33 percent. At the close of alternate jury selection, the prosecutor had struck 4 of 7 African-American jurors — an excusal rate of 57 percent — and had struck 15 of 47 non-African-American jurors — an excusal rate of 32 percent. Although the prosecutor excused a higher percentage of African-American jurors, the numbers are subject to a variety of interpretations. (See, e.g., *People v. Jones* (2011) 51 Cal.4th 346, 362 [peremptory challenges of 60 percent of African-American jurors "not particularly troubling" when strike rate of African-

Americans was only slightly higher than their percentage on the jury].) We note, for example, that the numbers could also indicate that African-American jurors were overrepresented in the box compared to their representation in the candidate pool: constituting 25 percent of the seated panel (3 of 12) as compared to 13 percent of the available pool (7 of 54). (See *People v. Hartsch* (2010) 49 Cal.4th 472, 487-488 (*Hartsch*).) In other words, African-American representation on the seated jury was almost twice that reflected in the eligible jury pool. In any event, in light of the small sample size, we assign no great weight to the prosecutor's excusal rate. (*People v. Harris* (2013) 57 Cal.4th 804, 835.)

Moreover, the prosecutor repeatedly accepted the jury when two African-American jurors were on the panel, and ultimately accepted a panel with three African-American jurors. "While acceptance of one or more black jurors by the prosecution does not necessarily settle all questions about how the prosecution used its peremptory challenges, these facts nonetheless help lessen the strength of any inference of discrimination that the pattern of the prosecutor's strikes might otherwise imply." (*Reed, supra,* 4 Cal.5th at p. 1000; see also *People v. Clark* (2011) 52 Cal.4th 856, 906.) We have previously held that the prosecutor's acceptance of a jury panel including multiple African-American prospective jurors, "while not conclusive, was 'an indication of the prosecutor's good faith in exercising his peremptories, and . . . an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection . . . .' " (*Hartsch, supra,* 49 Cal.4th at p. 487.) Viewed in its overall context, the pattern of strikes does not suggest an inference of discrimination.

Defendant also asserts the prosecutor's unjustified investigation into prospective juror Kenneth M. raises a suspicion that he was attempting to limit the participation of African-American jurors, arguing that the prosecutor appeared to conduct a criminal background check on only Kenneth M. The prosecutor's responses to the court, however, suggest that he did conduct a criminal history check on additional jurors. Although the prosecutor did not disclose which prospective jurors he investigated further, he told the court that he "was checking *some of the jurors* through the computer system" (italics added) and that he was "going to check *certain jurors* when they spark [his] interest" (italics added), indicating that Kenneth M. was not the only juror he investigated. Rather, the record suggests that Kenneth M. may have been the only juror checked who provided inaccurate information on his questionnaire. Although the prosecutor's background check on some jurors, including Kenneth M., may be probative concerning the issue of discriminatory intent, we conclude that this fact, without additional indicia of discriminatory purpose,[5] falls short of establishing a prima facie case. We also note that the record does not reveal any significant disparities in the nature or extent of the prosecutor's questioning of the African-American prospective jurors, and defendant does not argue otherwise.

In his dissent, Justice Cuéllar asserts that the prosecutor's "unwillingness" to answer defense counsel's question whether he checked only African-American jurors *in itself* constitutes an

---

[5]     If there were evidence that the prosecutor in fact targeted only African-Americans for background checks, we would agree that such conduct would plainly constitute a prima facie case of discrimination. But there is no such evidence here.

"implicit[] admission of discriminatory conduct." (Dis. opn. of Cuéllar, J., *post*, at p. 6.) We do not draw the same conclusion from the record. First, it is not incumbent on a prosecutor to respond to questions from defense counsel; questions to opposing counsel are properly funneled through the court. A prosecutor may have numerous innocuous reasons for not engaging with defense counsel, including not wanting to encourage further probing into a topic relating to jury selection or trial strategy. Indeed, in this case, defense counsel's query quickly morphed into repeated requests for the disclosure of "all the jurors" on which the prosecutor ran checks. Neither defendant nor Justice Cuéllar argue that the prosecutor was obligated to disclose this information, or that the failure to do so is evidence of discriminatory intent.

Second, even assuming that a response was required, the transcript of proceedings shows that the prosecutor did, in fact, give a nondiscriminatory reason concerning why he had not initially answered defense counsel's query. Specifically, the prosecutor told the court that he was objecting to defense counsel's questions relating to the investigation of prospective jurors because defense counsel had not yet "ma[d]e a prima facie case" under *Batson/Wheeler*. The trial court agreed with the prosecutor's assessment and declined to order disclosure on that basis. Thus, the record indicates that the prosecutor preferred not to reveal anything related to his jury selection and trial strategy unless ordered to do so, and he believed that defense counsel had not demonstrated that a response was required. Indeed, the prosecutor undertook the same approach following defendant's second *Batson/Wheeler* challenge, explaining that "if [the court] believe[s] [defendant] made a prima facie case based on what is before [the court], then I am required to

respond." That the prosecutor, citing *Wheeler*, declined defense counsel's request that he disclose information regarding the jurors he checked, does not constitute in itself "compelling evidence" of unlawful scrutiny. (Dis. opn. of Cuéllar, J., *post*, at p. 1.)

In short, the prosecutor was under no obligation to respond to defense counsel's question, and his stated reason for not answering it is innocuous and credible. We decline to adopt Justice Cuéllar's incongruous reasoning that, despite the trial court's finding that no prima facie showing of discrimination had been made, the prosecutor's refusal to answer defense counsel's query nonetheless gives rise to a prima facie inference of discriminatory purpose. We conclude that the prosecutor's refusal to answer defense counsel's question does not establish, alone or together with other circumstances, a prima facie case of discrimination.

Finally, defendant emphasizes that Cavallo and Mary S. are both Caucasian while he is African-American. Although the prosecution presented evidence that defendant committed violent acts against four additional victims, the races of these individuals are unknown. We acknowledge that when the race of the defendant is different from that of the victim, and the victim is a member of the group to which the majority of remaining jurors belong, this circumstance is one of many that is relevant to whether a prima facie case existed. (See *Johnson*, *supra*, 545 U.S. at p. 167; *Wheeler*, *supra*, 22 Cal.3d at p. 281.) However, as indicated above, because we have concluded that none of the other "especially relevant factors" — "whether a party has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that

group, [and] whether the party has engaged those prospective jurors in only desultory voir dire" (*Reed*, *supra*, 4 Cal.5th at pp. 999-1000) — are present, we do not infer discriminatory intent based solely on the fact that the known race of two of the victims is the same as that of a bare majority — 7 of 12 — of the seated jurors.[6]

Based on the entire record, we conclude the trial court did not err when it ruled that defendant had failed to show a prima facie case of discriminatory intent.[7]

---

[6]     We also disagree with Justice Cuéllar's characterization of the trial court's deeming the races of the victims and defendant as a "side issue that we need not get into"; rather, the record shows that the trial court made this comment in the context of explaining that a defendant need not be the same race as the excused jurors in order to make a *Batson/Wheeler* motion.

[7]     Because we have concluded that defendant failed to raise an inference of discrimination, we need not resort to examining the record for obvious race-neutral reasons for the prosecutor's peremptory strikes that would " 'necessarily dispel any inference of bias[.]' " (*Reed*, *supra*, 4 Cal.5th at p. 1000.) However, because the dissenting justices rely heavily on the characteristics of the excused African-American jurors, we feel it appropriate to note that, at least with respect to three of the four jurors, there *do* appear to be "clearly established" and "apparent" nondiscriminatory reasons for their excusal. (*Ibid.*) Kenneth M. lied on his jury questionnaire about two criminal convictions. Shanna H. wrote that her son had been arrested twice, including once for rape, and she testified that she felt the court process was unfair and that her son may have been coerced into accepting a plea bargain for a crime he did not commit. Sharon H. had worked extensively with abused and troubled adolescents, including youths from juvenile courts, and she stated that she had a "heart" for "what we call throw-away kids." Defendant's mitigation case focused on childhood abuse and

## C. Removal of Juror for Cause

Defendant contends the trial court erred when it excused prospective juror Laura C. for cause based on her opinions and beliefs regarding the death penalty. Defendant asserts the court asked misleading questions and provided inaccurate information to the juror regarding the nature of a jury's sentencing discretion.

In her jury questionnaire, Laura C. stated that she was a legal secretary and identified herself as a practicing Catholic. When addressing whether she would automatically refuse to vote in favor of the death penalty, she wrote, "No. As a fair-minded person and legal secretary familiar with legalities I would make a judgment based on all factors before making any decision." When asked about her general feelings regarding the death penalty, she explained, "I would prefer a society where people lived happily together and no crimes ever happened — but that is not the real world — so I understand that for those people who commit crimes or who think about it, the death penalty must be there as a reminder of what the consequence might be because of their actions. This penalty thus protects the

---

neglect; to the extent the prosecutor anticipated that defense, Sharon H. would clearly be an undesirable juror from the prosecution point of view. These revelations provide a readily apparent, race-neutral basis to excuse each of these prospective jurors. Although the fourth juror, Lois G., presented no such obvious grounds for excusal, the existence of readily apparent grounds for three of the four disputed prospective jurors would undercut, to some degree, whatever possible inference of discrimination that might otherwise arise from the pattern of excusals considered in isolation. But once again, here we conclude that the statistics alone did not give rise to an inference of discrimination.

peaceful people." Concerning whether she had any religious objections to the death penalty, she wrote, "Yes/No. I believe people should live their lives for as long as God lets them, despite what kind of life that may be — a person should experience his whole life — however, I believe that the death penalty needs to be a reminder to all who would endanger others."

During voir dire, the court asked Laura C. if the answers she provided on the questionnaire accurately reflected her feelings regarding the death penalty, and she confirmed that they did. She confirmed that she would be able to follow the law and guidance given to the jurors. The court explained, "You understand the law does not — well, in a sense it mandates a result in some situations. If you find that the mitigating circumstances are substantial, that they outweigh the aggravating or that they're equal to the aggravating, they are balanced. Then, in that situation, the law says you cannot return a death penalty, but you can only return life without parole." Laura C. replied, "Yes. I am happy for that." The court continued, "If, on the other hand, the aggravating circumstances substantially outweigh the mitigating, at that point, the law does not mandate the death penalty, but it says [the jurors] still have the option of choosing not to impose the death penalty, if they feel that that is not the most appropriate punishment. . . . Now, is there anything in that structure that would cause you any problems?" Laura C. said, "No."

Defense counsel stated that he was "a little bit confused" about the juror's attitudes concerning the death penalty based on her answer that a person should experience his whole life. Counsel asked, "Are you of the belief that only God can take a life?" Laura C. replied, "That would be my number one belief."

She acknowledged the law in California, and said, "I have tried to integrate my Christian beliefs with the real live world that we live in. . . . I believe that when there is a law, and I need to decide on that law, I do use my Christian values, too, my Christian values here in this situation. You have not only a civic responsibility, you have a Christian responsibility to be true to your decision, to be fair to, not only my Christian values, but also to society. It's a very hard thing to integrate, but somehow I feel that I am able to do that."

Defense counsel said, "The judge, a little bit earlier, told you that even if you found the evidence that the district attorney put on was — was substantially greater, the aggravating evidence was substantially greater than the mitigating evidence, you could still return a life without the possibility of parole verdict, and that would still be following the law. Do you feel comfortable with that concept?" Laura C. replied that she did. Defense counsel continued, "And if eleven other jurors were to tell you quite candidly, and with no reservation, that the district attorney had proven — has met his burden, and they all feel the death penalty is appropriate, and that's the way they desire you to vote or give your individual opinion. If you still felt that this was a life without possibility of parole, could you stand by your individual conviction?" Laura C. replied, "I am glad you brought that up because I would, of course, very candidly take the lesser, life imprisonment without parole. I would like — I would prefer that judgment over the death penalty in this particular situation if aggravating circumstances were more, so, and I have that choice. I have the freedom of choice, and that's not against the law. I have that choice, and it's legal, and I would go for the life imprisonment."

Defense counsel clarified, "So, no matter what evidence the district attorney put on, you would only feel life without possibility of parole would be suitable?" Laura C. replied, "If that is my legal choice, if I have a choice legally to do that, that's the way I would vote." Defense counsel reminded Laura C. that she previously said she would feel comfortable following the law and asked if there were circumstances in which she could apply the death penalty. Laura C. explained, "If it lent more over to the aggravating side, and that's a very good question, possibly not. I would prefer the life imprisonment without parole."

The prosecution challenged Laura C. for cause. The court asked the juror: "[C]orrect me if I am wrong, but I get the impression from the discussion we've had here, this morning, that you could return a death penalty if the law basically compelled it?" Laura C. nodded her head. The court continued, "Because you're willing to and feel the obligation to follow the law?" Laura C. replied, "That's right." The court said, "Okay. But in this case, in fact, in any death penalty case, the law does not ever compel a death verdict. Even when the aggravating factors clearly and substantially outweigh the mitigating factors, the law allows the juror — the law says the jurors may impose the death penalty, but the law does not compel it. It allows a juror to or a jury to decide, in spite of the heavy aggravating factors that for whatever reason might be mercy, they choose to give life without the possibility of parole, so, there is always an option. The law never compels the death penalty." Laura C. acknowledged the court's comments with "okay." The court continued, "And what it strikes me is since you prefer, you made it clear you prefer, significantly prefer, life without the possibility of parole to the death penalty, and if the law is never going to force you, or direct you, or compel you to return a death

51

penalty, is it true that, in effect, you would be returning a life without possibility of parole? That would be your vote in virtually every case?" Laura C. replied, "I would have to say, yes. . . . I didn't realize that, you know. It went over my head that there isn't a law that said that compels you. There are no guidelines. There are no factors. . . . My answer is just, yes." The court granted the prosecution's challenge for cause.

"It is well established that opposition to the death penalty does not by itself disqualify a juror from sitting on a capital case." (*People v. Penunuri* (2018) 5 Cal.5th 126, 141; see *Witherspoon v. Illinois* (1968) 391 U.S. 510, 522.) A prospective juror may be excluded for cause only when "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424.) " '[I]n applying this standard, reviewing courts are to accord deference to the trial court. . . . [W]hen there is ambiguity in the prospective juror's statements, "the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State." ' " (*Penunuri*, at p. 141.)

Laura C.'s answers during voir dire indicated that although she understood the law and was not opposed to the death penalty generally, she would be unwilling to return a verdict of death no matter what evidence the prosecution presented. Indeed, after the trial court informed her that the law never compels a death verdict, she confirmed that unless she was forced or compelled to do otherwise, she would return a verdict of life without the possibility of parole in virtually every

case. Although her answers on the jury questionnaire indicated that she could follow the law as instructed, she admitted to the court that upon realizing she would not be compelled to return any specific verdict, she would not be open to returning a verdict of death. We conclude that Laura C.'s responses sufficiently indicated that her views would prevent or substantially impair the performance of her duties as a juror, and therefore the trial court did not abuse its discretion in granting the prosecution's request to remove her for cause.

## D. Consideration of Aggravating Evidence

Defendant contends the trial court erred in permitting the jury to consider the crimes against Mary S. as aggravating evidence under section 190.3, factor (b) because there was insufficient evidence that he was the assailant.

As noted above, in his first trial, defendant was found guilty of raping and assaulting Mary S. On appeal, we ultimately reversed these convictions after concluding that Mary S.'s posthypnotic identification of defendant was inadmissible under *Shirley*, *supra*, 31 Cal.3d 18. (*People v. Johnson*, *supra*, 47 Cal.3d 576.)

At the second penalty phase retrial, the prosecution introduced evidence of the rape and assault as aggravating evidence under section 190.3, factor (b), rather than retrying the offenses. The defense unsuccessfully moved in limine to have the evidence excluded or tried by a separate jury.

The prosecution introduced evidence suggesting that defendant used the pistol and bullets stolen from Cavallo's residence to attack Mary S. After the prosecution concluded its case, the defense argued that insufficient evidence supported a finding that defendant committed the crimes against Mary S.,

and likened its argument to a motion for acquittal. The defense noted that Mary S. had not identified defendant as her assailant, and the only evidence against him was a fingerprint on the gun clip, "a moveable object." During a hearing on the defense's motion outside the presence of the jury, the prosecutor acknowledged that the gun's magazine was a moveable object but argued that "a magazine is an object that normally is not one that is touched by someone in a casual fashion. The magazine or a clip belongs inside the weapon and is normally carried there." He continued, "[T]he magazine is not in a position where it's casually touched, as though someone were handing around a weapon at a weenie roast somewhere, and you just happen to touch it. All right. It's inside the handle of the weapon, and the fingerprint is on a place where it would normally be to load the weapon." The prosecutor went on to summarize relevant testimony about the fingerprint found on the magazine and testimony that Cavallo owned a similar weapon. The court denied defendant's motion, concluding that sufficient evidence linked him to the assault and "that there is sufficient evidence upon which a reasonable jury could find that the defendant did, in fact, commit the rape."

Section 190.3, factor (b) permits the jury to consider the "presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Before the evidence is presented to the jury, the trial court must determine that the evidence offered would allow a rational trier of fact to decide beyond a reasonable doubt that the defendant committed the criminal activity alleged under factor (b). (*People v. Clair* (1992) 2 Cal.4th 629, 676.) Once presented, whether the evidence of other acts is significant enough to be given weight in

the penalty determination is for the jury to decide. (*People v. Smith* (2005) 35 Cal.4th 334, 369.)

We review a trial court's decision to admit evidence of other crimes for abuse of discretion, " 'and no abuse of discretion will be found where, in fact, the evidence in question was legally sufficient.' " (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 225.) "On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt. [Citations.] Evidence meeting this standard satisfies constitutional due process and reliability concerns." (*People v. Boyer* (2006) 38 Cal.4th 412, 479-480.)

Defendant asserts the evidence was insufficient because the gun clip was a movable object. He relies on *Mikes v. Borg* (9th Cir. 1991) 947 F.2d 353 (*Mikes*), a case in which the prosecution's only evidence against the defendant consisted of fingerprints found on a disassembled turnstile the victim had recently purchased at a going-out-of-business sale. (*Id.* at p. 355.) The federal appellate court stated that "in fingerprint-only cases in which the prosecution's theory is based on the premise that the defendant handled certain objects *while committing the crime in question,* the record must contain sufficient evidence from which the trier of fact could reasonably infer that the fingerprints were in fact impressed at that time and not at some earlier date." (*Id.* at pp. 356-357.) The court held that the defendant's conviction could be upheld only if the record showed that the object in question was inaccessible to him at the " 'relevant time,' " defined as "the time prior to the commission of the crime during which the defendant reasonably could have placed his fingerprints on the object in

question *and* during which such prints might have remained on that object." (*Id*. at p. 357.) Because the turnstile presumably had been in operation before being sold, the evidence was insufficient to preclude the reasonable possibility that the defendant placed his fingerprints on the item prior to the victim's acquisition of it. (*Id*. at pp. 358-359.)

Defendant also relies on *People v. Trevino* (1985) 39 Cal.3d 667. In *Trevino*, the defendant and codefendant were charged with the murder and robbery of their friend. (*Id*. at p. 676.) The only evidence linking the codefendant to the scene of the crime was a fingerprint found on a dresser drawer. (*Id*. at p. 678.) The fingerprint expert could not determine the date of the print, acknowledging that it could have been made months earlier. (*Ibid*.) We held that the fingerprint evidence could not be considered substantially incriminating. (*Id*. at p. 696.) Because the expert could not determine the age of the print, there was no reason to presume it had been made on the day of the crime rather than a previous occasion. (*Id*. at pp. 696-697.) We noted that the " 'evidence as to how or when the print came to be placed on the dresser is fraught with uncertainty, leaving the triers of fact to speculate as to how and when the print was made. This kind of guesswork as to the facts does not elevate speculation to the level of reasonable inference.' " (*Id*. at p. 697.)

*Mikes* and *Trevino* are easily distinguished from this case. In *Mikes*, the turnstile containing the defendant's fingerprint was "fully accessible to the general public" before the victim acquired it, and the defendant could have placed his fingerprint on the object during that period. (*Mikes, supra,* 947 F.2d at pp. 358-359.) Here, by contrast, there was no evidence the magazine was accessible to the general public before the crime against Mary S., making *Mikes* distinguishable on that basis.

Moreover, there was no indication that defendant knew Cavallo or had ever been inside Cavallo's home before he was killed, and yet defendant's fingerprint was found on an object taken from inside Cavallo's home and found at the site where Mary S. was assaulted. Additionally, it is clear the gun was loaded when Mary S. was attacked because a shot was fired in the bathroom during the commission of that crime. It is therefore reasonable to conclude that defendant loaded the weapon or checked the clip immediately before using it to assault Mary S.

In *Trevino*, the codefendant was the victim's friend and presumably had been at the victim's house on occasions prior to the day of the homicide. Because the date of the fingerprint could not be determined in that case, no solid evidence linked the codefendant to the scene on the day of the murder. Here, as noted above, defendant's fingerprint was found on the magazine within a gun that belonged to Cavallo, who did not know defendant. Moreover, unlike in *Trevino*, the prosecution's fingerprint expert testified that the fingerprint powder "leaped out" at him, which indicated that the print was fresh when Mary S. was assaulted. Therefore, the evidence of defendant's fingerprint on the magazine of the gun used to attack Mary S. was sufficient to establish identity.

For the reasons stated above, the evidence was sufficient for a rational trier of fact to determine beyond a reasonable doubt that defendant committed the attack on Mary S. The trial court, therefore, did not abuse its discretion in admitting evidence of the rape and assault against Mary S. Because the trial court did not err, defendant's rights to due process, a fair trial, and a reliable penalty verdict under the United States Constitution were not violated.

### E. Admission of Hearsay Statements

Defendant contends the trial court erroneously admitted hearsay statements from Cavallo's friend, Richard Canniff, who testified that Cavallo kept a gun at home. Defendant asserts the statements were inadmissible as evidence of habit.[8]

Canniff died before the second penalty phase retrial. Defendant filed a written motion in limine to exclude Canniff's prior testimony as inadmissible hearsay. Defendant did not challenge Canniff's unavailability. Rather, defendant was specifically concerned with Canniff's testimony that Cavallo kept a small gun near him in his house; Canniff admitted he never personally saw a gun at Cavallo's residence. The prosecution argued the evidence was admissible as evidence of habit because Cavallo customarily kept a gun near his bed for protection. He also argued that Canniff's statements tended to show Cavallo was asleep when he was killed, because Cavallo did not have time to reach for the gun.

The court admitted Canniff's testimony over defendant's objection. The prosecution read Canniff's testimony from the guilt phase, during which Canniff said that Cavallo kept a small gun for protection. Canniff explained, " 'It had to be close to his bed. . . . He was never — he said repeatedly to me and others that he was never going to be caught off guard by anyone.' " He

---

[8]     The Attorney General argues that defendant forfeited his challenge to the admission of Canniff's hearsay statements by not objecting directly before the testimony was read. However, defendant filed a motion to exclude Canniff's testimony before trial. The Attorney General also alleges the evidence was admissible as nonhearsay under Evidence Code section 1250 to show that Cavallo was asleep when he was killed, but cites no authority to support this claim.

said that Cavallo " 'frequently' " mentioned keeping a gun for protection.

Evidence Code section 1105 provides: "Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom." " ' "Habit" means a person's regular or consistent response to a repeated situation. "Custom" means the routine practice or behavior on the part of a group or organization that is equivalent to the habit of an individual.' " (*People v. Memro* (1985) 38 Cal.3d 658, 681, fn. 22.) Because evidence of habit or custom must be "otherwise admissible," any hearsay evidence of habit must fall within an exception to be admissible. (See Evid. Code, § 1200 [hearsay evidence is inadmissible except as provided by law].) The determination whether habit evidence is admissible rests in the sound discretion of the trial court. (*People v. Hughes* (2002) 27 Cal.4th 287, 337.) The erroneous admission of hearsay is reviewed under the reasonable possibility standard. (*People v. Brown* (1988) 46 Cal.3d 432, 447-448 (*Brown*); see *People v. Page* (2008) 44 Cal.4th 1, 54.)

Defendant asserts the evidence was inadmissible hearsay and the trial court erred in admitting Canniff's testimony as evidence of habit. He also asserts that the testimony was insufficient to show habit because it failed to establish a regular or consistent response to a repeated situation. Even assuming the trial court erred in admitting the statements, however, there is no reasonable possibility that a result more favorable to defendant would have been reached in the absence of the asserted error. (*Brown, supra*, 46 Cal.3d at p. 448.) The court admitted the testimony of two other witnesses from prior trials concerning Cavallo's ownership of a .22-caliber handgun, and Cavallo's ex-wife testified that he owned such a handgun.

Additionally, testimony from the officer who found Cavallo's body supported an inference that Cavallo had been asleep during the attack. Thus, any error in admitting Canniff's testimony was harmless.

### F. Evidence of Failure to Apologize to Prior Victim

Defendant contends the trial court abused its discretion when it admitted evidence that defendant did not apologize to Florence M. or ask her about the fate of her child after his conviction for stabbing her. He asserts her statement regarding his lack of apology was irrelevant to proving a factor in aggravation.

Florence M. testified about the 1971 stabbing incident. She explained that after her testimony in the first trial, she and her husband, defendant's half-brother, visited defendant at a state psychiatric hospital. Over defendant's objection, the prosecutor asked Florence M., "Did he apologize to you in any way for what he done [*sic*] to you?" She replied, "No, no way at all." The prosecutor asked, "Did he ask you anything about the baby?" Florence M. answered, "No, he didn't say anything about that."

A lack of remorse is not enumerated as an aggravating factor under section 190.3. A prosecutor, therefore, should not argue that the absence of remorse is a factor in aggravation. (*People v. Keenan* (1988) 46 Cal.3d 478, 510; see also *People v. Rivera* (2019) 7 Cal.5th 306, 343 (*Rivera*) [postcrime evidence of remorselessness does not fit within any statutory sentencing factor and should not be urged as aggravating].)

Assuming without deciding that the court erred in admitting Florence M.'s statement that defendant did not apologize or ask about her baby, however, we see no reasonable

possibility that the error affected the jury's death verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *Rivera, supra,* 7 Cal.5th at pp. 343-344; *People v. Nelson* (2011) 51 Cal.4th 198, 218, fn. 15.) The prosecution presented other aggravating evidence in support of a death verdict, including the circumstances of the crimes against Cavallo, defendant's prior felony convictions, and his prior instances of violent criminal conduct, including the rape and assault of Mary S. Nothing suggests that Florence M.'s testimony regarding defendant's lack of remorse "tipped the scales in favor of death." (*Rivera*, at p. 344.) We therefore conclude any error in admitting the testimony was harmless beyond a reasonable doubt.

### G. Admission of Aggravating Evidence Without Notice

Defendant contends the trial court abused its discretion when it admitted evidence in aggravation with assertedly inadequate notice.

Nine days after the attack on Florence M., CHP Officer Lance Erickson stopped defendant for committing a traffic violation. As noted earlier, Erickson arrested defendant for grand theft of an automobile. When detained, defendant told Erickson that he thought he had killed his pregnant sister-in-law by stabbing her "from the neck down to her stomach."

Before the first penalty phase retrial, the prosecution filed a list of possible witnesses, which included Erickson. Because Erickson's original police report had been destroyed a few years after the grand theft case closed, the parties used a report about that case prepared for the Los Angeles Police Department (LAPD) by another officer.

The prosecutor met with Erickson the night before he was scheduled to testify in the second penalty phase retrial. Erickson informed the prosecutor about additional facts not in the LAPD report, including that defendant ran from and struggled with the officers, made statements to the effect that he would shoot them if he had a gun, and admitted that he had stabbed, raped, and killed his pregnant sister-in-law during an argument because she "was coming on to him."

The prosecutor acknowledged to the court that the additional information was new to him and to the defense. He then sought to introduce the statements defendant had made about Florence M. and her making sexual advances toward him, arguing that they were indicative of a guilty mind and were clearly "false statements" about the attack. Defendant opposed admission of the statements, arguing that they lacked adequate notice and the prejudicial effect of the evidence outweighed the probative value under Evidence Code section 352.

Following an evidentiary hearing outside the presence of the jury to hear Erickson's testimony, the court admitted defendant's statements concerning why he stabbed Florence M. The court reasoned that the inclusion of Erickson's name on the witness list for the first penalty retrial and the admitted LAPD report provided the defense with adequate notice to contact Erickson and interview him well before the second penalty retrial. The court also observed that the LAPD report "indicates that there was some statement made to the Highway Patrol about the Florence [M.] incident. Either side could have explored that and been ready for it. It just turns out that neither side did look into it in detail." The court denied defendant's motion to exclude the statements and his request for a substantial delay in proceedings to investigate the matter.

The court also concluded that "the information [Erickson] offers is very relevant to the state of mind of the defendant concerning this incident and his attitude toward this incident, how he feels about the violence he visited upon his sister-in-law. It all goes to character and the quality of the criminal conduct involved. So, in that sense, I consider it very probative, and, of course, in a sense it's prejudicial, but in a penalty trial . . . [the] issue of the prejudicial nature of the evidence . . . doesn't have the same application as it does in a guilt trial."

Section 190.3 requires the prosecution to provide the defendant with notice of the evidence to be introduced within a reasonable period of time prior to trial. "Nothing in the language of section 190.3, however, suggests that it was intended to grant the defendant any greater rights with respect to penalty phase evidence, or that evidence of which the prosecution had no knowledge when the original notice is given must be excluded. Such a construction would be inconsistent with the purpose of section 190.3 that the jury be made aware of all of the factors bearing on the penalty decision." (*People v. Jennings* (1988) 46 Cal.3d 963, 987.) If the prosecution discovers new evidence that it wishes to present after the initial notice, it must promptly notify the defendant. (*Ibid.*) If necessary, the defendant is entitled to a reasonable continuance to allow time to prepare. (*Ibid.*)

We find no error in admitting the evidence. Defendant knew Erickson was on the witness list for the first penalty phase retrial and had more than a year to contact him if defendant wished to inquire about the circumstances surrounding his arrest. Further, the LAPD report stated that defendant said he stabbed and killed Florence M. Although the report did not include the information regarding *why* defendant stabbed

Florence M. — that they argued because she allegedly made sexual advances toward him — the report provided the defense with sufficient notice that defendant may have said something about the assault against Florence M. The first penalty retrial witness list and LAPD report provided to defendant gave him sufficient time to prepare a defense to the aggravating evidence. (See *People v. Howard* (2008) 42 Cal.4th 1000, 1016.) The prosecutor also promptly notified the defense of the new information the morning after he spoke with Erickson.

Moreover, the trial court did not abuse its discretion when it found the evidence was more probative than prejudicial. "Prejudicial" means evidence " 'that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues.' " (*People v. Thomas* (2012) 53 Cal.4th 771, 807 (*Thomas*).) "A trial court's exercise of discretion under [Evidence Code] section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner." (*Id*. at p. 806; see Evid. Code, § 352.) Defendant cannot establish that the trial court did so here. Defendant's statements had probative value by showing that he attempted to shift blame to the victim, did not feel empathy for the victim, and did not take responsibility for his actions.

## H. Evidence of Offense Committed After Capital Offense

Defendant contends the trial court erred when it instructed the jury that it could consider as an aggravating factor defendant's conviction for assault with a deadly weapon on Verna O., because he was convicted of this crime after the capital offense. Therefore, he asserts, it was not a prior conviction within the meaning of section 190.3, factor (c).

Defendant attacked Verna O. on December 2, 1978, prior to the murder of Cavallo. He was convicted of the charge relating to the offense against Verna O., however, shortly after he committed the capital offense. The court determined that a "prior felony conviction" under section 190.3, factor (c), was admissible if the conviction occurred after the capital offense but before trial. Over defendant's objection, the trial court instructed the jury that it could consider the attack on Verna O. as an aggravating factor under section 190.3, factor (c).

The Attorney General concedes that defendant's conviction for the assault on Verna O. was inadmissible as a prior felony conviction under section 190.3, factor (c). (See *People v. Balderas* (1985) 41 Cal.3d 144, 201 (*Balderas*) ["prior felony convictions" are limited to those entered before commission of the capital crime].) However, we conclude the error is harmless because there is no reasonable possibility that defendant would have received a more favorable result absent the error. (See *Brown, supra*, 46 Cal.3d at p. 448-449; *People v. Lewis* (2008) 43 Cal.4th 415, 527 [" 'reasonable possibility it affected the verdict' " standard is essentially the same as beyond a reasonable doubt standard in *Chapman, supra*, 386 U.S. at p. 24].) The weight of the other aggravating evidence was substantial. The prosecution introduced evidence of the circumstances of defendant's robbery and murder of Cavallo, his assault and rape of Mary S., and his threat to dissuade Florence M. from testifying. The prosecution also introduced evidence that defendant had been convicted of three other violent felonies. The properly introduced aggravating evidence substantially outweighed the mitigating evidence. Further, the prosecutor only briefly discussed the Verna O. assault during his closing argument. It is not reasonably possible that the

exclusion of this conviction would have altered the jury's balancing of evidence in this case.

Moreover, the evidence would have been properly admissible under factor (b) as the presence of criminal activity by defendant that involved the use of force or violence. We have previously acknowledged that factors (b) and (c) serve distinct purposes — factor (b) admits evidence of violent criminality to show a defendant's propensity for violence, while factor (c) admits evidence of *any* prior felony conviction to show that the capital offense was the culmination of habitual criminality. (*Balderas, supra,* 41 Cal.3d at p. 202.) We have also held that when a prior conviction is erroneously admitted under factor (c) but properly admitted under factor (b), a defendant cannot establish prejudice because the additional fact of a conviction " 'could have added very little to the total picture considered by the jury.' " (*People v. Hayes* (1990) 52 Cal.3d 577, 637-638.)

Defendant asserts this case is different because the jury was instructed to consider only those factor (b) criminal acts listed in the corresponding instruction; the Verna O. assault was not listed. Therefore, he contends, but for the erroneous factor (c) instruction, the jury would not have considered the Verna O. assault at all. Although the jury was not instructed to consider evidence of the Verna O. assault under factor (b), we are not persuaded that the instructional error undermined the verdict. The prosecution did not overlap offenses between the factor (b) and factor (c) instructions; all four of the offenses listed under factor (c) could have been included in the factor (b) instruction, but were not. It is reasonable to assume that had the court denied the prosecution's request to include the Verna O. attack under factor (c), the prosecution would have then simply

requested it be enumerated in the factor (b) instruction provided to the jury. Further, to the extent the factor (b) instruction omitted an offense that should have been included, defendant did not object to the modified instruction in the trial court. "It is incumbent on defense counsel to point out an omitted incident and request a more complete instruction on the subject." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1122.)

For the reasons stated, we discern no prejudice under the facts.

### *I.* **Loss of Defense Exhibit**

Defendant contends the trial court's loss of an exhibit deprived him of due process and a fair penalty trial. He further asserts the court abused its discretion when it denied his motion for a new trial based on the omission.

Kenneth Peterson testified for the defense. Peterson was the chief social worker for a youth home where defendant resided in the 1960s. Peterson explained that children referred by juvenile court would be evaluated at the youth home, and those diagnosed as mentally ill would be transferred to a state hospital. Because the state hospitals had many long-term patients, children at the youth home faced a delay in being transferred. On April 14, 1965, Peterson sent a letter to the chief social worker at one of the state hospitals, explaining that the youth home had arranged for defendant to be committed to the state hospital the previous summer, but he had not yet been placed there eight months later. Peterson testified that the youth home did not have facilities for treating mentally ill children. During cross-examination, the prosecution had Peterson read aloud the parts of the letter describing defendant's symptoms and struggles at the youth home.

Peterson acknowledged that he had never personally worked with defendant; rather, he relied on reports from other people when writing the letter. The letter was admitted into evidence as Exhibit N.

Richard Komisaruk, a psychiatrist who worked with the youth home, also testified for the defense. He affirmed Peterson's testimony that the wait list for children to enter a state hospital for mental health treatment was very long. He testified that in the early 1960s Caucasian children were accepted into state hospitals "at a much higher frequency" compared with ethnic minorities. Komisaruk explained that when children were finally admitted into the state hospital, the hospital would often rediagnose children and claim they needed to be in reform school, not a hospital. Komisaruk conducted a study that revealed "there was a greatly disproportionate[] representation of Black people in this group of rediagnosed individuals who were sent back from the State hospital and were relegated to treatment within the criminal justice system."

The prosecution showed Komisaruk Exhibit N. The prosecution also showed Komisaruk a report, dated July 1965, from the state hospital that eventually admitted defendant. Komisaruk read from the report: "We arranged with Doctor Komisaruk to admit this child and discharge him. It was also agreed upon that should the youngster become involved with the law once more, that Doctor Komisaruk in the Juvenile Court would commit him to Boys Training School." Although Komisaruk did not recall ever interacting with defendant prior to testifying, he explained that in similar situations, a patient who "look[ed] like a psychopath" or "a sociopath" and who it was believed would not benefit from treatment would be discharged from the hospital and sent to the Boys Training School.

The defense realized shortly after Komisaruk testified that he accidentally took two exhibits with him, including Exhibit N. Komisaruk died soon after returning to his home state, and the exhibit was never returned. Neither the court nor the parties realized that Exhibit N had not been retained by the court and given to the jury until after the verdict was received. Defendant filed a motion for a new trial arguing, in part, that the missing exhibit "was a substantial piece of evidence in mitigation" that would have garnered sympathy for defendant. The court denied the motion, finding that the fact that the exhibit was missing was not prejudicial. The court acknowledged that the jury did not have the "opportunity to study, weigh, or deliberate upon the importance of this single document." The court concluded, however, that "the substance and information and significance of that letter and significance of that information was communicated to the jurors" through testimony by Peterson and Komisaruk, and a substantial portion of the letter was read into the record. Additionally, the court noted, the jury did not request the letter or otherwise note its absence.

We will not disturb a trial court's denial of a motion for a new trial unless "a 'manifest and unmistakable abuse of discretion' " clearly appears. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 127.) We find no abuse of discretion. The trial court carefully weighed defendant's argument and whether the failure to transfer Exhibit N to the jury could have affected the outcome of the trial. We also note that significant portions of the letter were read aloud to the jury, and its contents were discussed by two witnesses. Defendant has not explained how the document itself would hold any evidentiary value beyond its content.

Further, defense counsel did not rely on the contents of the letter during closing argument. Rather, he emphasized the importance of Komisaruk's testimony, asserting that African-American children were seen as "sociopaths" who "were warehoused" in the youth home instead of receiving treatment. He also reminded the jury that defendant had been committed to a state hospital several times for being mentally incompetent and the juvenile court system failed to provide him with the mental health assistance that he needed. The record supports a finding that the actual presence of the letter during deliberations would have yielded no significant difference.

For these reasons, the absence of Exhibit N did not deprive defendant of due process and a fair penalty trial. There is no reasonable possibility that defendant would have received a more favorable result absent the error. (See *Chapman*, *supra*, 386 U.S. at p. 24; *Brown*, *supra*, 46 Cal.3d at pp. 448-449.)

## J. Cumulative Error

Defendant contends reversal is warranted because of the cumulatively prejudicial effect of penalty phase errors. We have found four possible errors: admission of Florence M.'s testimony regarding defendant's remorselessness, admission of Canniff's hearsay testimony, the erroneous instruction on consideration of the Verna O. conviction, and the failure to transfer Exhibit N to the jury. None of these errors was prejudicial. We conclude that no error in the penalty phase, whether considered alone or together, merits reversal. (See *People v. Souza* (2012) 54 Cal.4th 90, 139, 141 [a few nonprejudicial instructional errors do not warrant reversal on cumulative error claim].)

## III. OTHER ISSUES

### A. Denial of Application to Modify Verdict

Defendant contends the trial court abused its discretion when it denied his application to modify the death verdict under section 190.4, subdivision (e). He first contends the trial court improperly considered the underlying facts of the assaults on Florence M. and Verna O. He acknowledges this evidence was admitted during the penalty phase but claims the trial court could not rely on this evidence because the jury was not instructed to consider them as aggravating factors under section 190.3, factor (b). He asserts the court was free to consider his convictions in connection with the two incidents under section 190.3, factor (c), but could not properly consider the details of the acts that led to the convictions.

Defendant also contends the court erroneously relied on facts unavailable to the jury. The Attorney General concedes that the court improperly considered two pieces of evidence that it excluded from the jury's consideration under Evidence Code section 352: previously excluded evidence that defendant had raped Florence M. while attacking her, and a letter defendant wrote to the trial judge in the Verna O. case, requesting release on bail and asserting his innocence.

When ruling on an application to modify the death verdict, the trial court "shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." (§ 190.4, subd. (e).) "In ruling on the application to modify, the

trial court does not make an independent penalty determination, but instead reweighs the evidence of aggravating and mitigating circumstances and then determines whether the weight of the evidence supports the jury verdict." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1096.) We independently review the trial court's ruling in light of the record. (*Ibid.*)

We conclude that the trial court properly denied defendant's motion to modify the death verdict. Concerning defendant's first contention, although the trial court erroneously instructed the jury concerning the Verna O. attack under section 190, factor (c), as noted above, the facts underlying the assault were nonetheless properly admissible under section 190, factor (b). Because the underlying facts of the assaults on Florence M. and Verna O. were properly admitted, the jury would have considered this evidence in making its penalty determination and the court properly considered the details of the assaults when reweighing the evidence under section 190.4, subdivision (e).

Regarding defendant's second contention, as the Attorney General concedes, the trial court erred when it considered the rape of Florence M. and the letter defendant wrote requesting bail. (See *People v. Visciotti* (1992) 2 Cal.4th 1, 78 [the court is limited to consideration of the evidence that was before the penalty jury].) This error, however, does not require reversal. The court acknowledged the presence of mitigating factors, but found that "the significance of that mitigation becomes attenuated or lessens as one has opportunities to grow and to develop some maturity and to learn from experience." The court described the "rather gross and truly disturbing aggravating factors in [defendant's] history" and noted that "the continuity

of that violence over a period of time is so extreme." Given the court's finding that a history of extreme violence "substantially outweigh[ed]" the presence of mitigating factors, there is no reasonable possibility that it would have modified the death verdict absent consideration of the excluded evidence.

## B. Challenges to the Death Penalty Law

Defendant presents several challenges to California's death penalty law that our prior decisions have considered and rejected. He provides no persuasive reason for us to reexamine the following conclusions:

"Allowing the jury to consider the circumstances of the crime (§ 190.3, factor (a)) does not lead to the imposition of the death penalty in an arbitrary or capricious manner." (*People v. Kennedy* (2005) 36 Cal.4th 595, 641.)

The death penalty statute "is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." (*People v. Snow* (2003) 30 Cal.4th 43, 126 (*Snow*).) These conclusions are not altered by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, or *Ring v. Arizona* (2002) 536 U.S. 584. (*People v. Simon* (2016) 1 Cal.5th 98, 149.) Likewise, the high court's decision in *Hurst v. Florida* (2016) 577 U.S. ___ [136 S.Ct. 616], which invalidated Florida's capital sentencing scheme, does not invalidate California's law because our sentencing scheme is " 'materially different from that in Florida.' " (*People v. Becerrada* (2016) 2 Cal.5th 1009, 1038; *People v. Rangel* (2016) 62 Cal.4th 1192, 1235, fn. 16.)

The use of the term "so substantial" in CALJIC No. 8.88 does not render the instruction impermissibly broad. (*People v. Breaux* (1991) 1 Cal.4th 281, 316, fn. 14.)

If the trial court instructs the jury that it can impose the death penalty only if it finds that aggravation outweighs mitigation, it need not also instruct the jury on the converse — that it must return a sentence of life without the possibility of parole if it finds that mitigation outweighs aggravation. (*People v. Duncan* (1991) 53 Cal.3d 955, 978.)

Instructions on the meaning of a sentence of life imprisonment without the possibility of parole and on the " 'presumption of life' " are not constitutionally required. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43.)

CALJIC No. 8.88 adequately instructs the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty. (*People v. Arias* (1996) 13 Cal.4th 92, 171.)

"Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required." (*Snow*, *supra*, 30 Cal.4th at p. 126.)

California's death penalty does not violate international law or international norms of decency. (*Thomas*, *supra*, 53 Cal.4th at p. 837.)

## IV.  CONCLUSION

The judgment is affirmed.

**CANTIL-SAKAUYE, C. J.**


**We Concur:**

**CHIN, J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**

PEOPLE v. JOHNSON

S029551


Dissenting Opinion by Justice Liu


This is yet another case in which a black man was sentenced to death for killing a white victim after a jury selection process in which the prosecution disproportionately excused black prospective jurors. And this is yet another case in which this court has refused to find any inference of discrimination in jury selection, despite a well-founded suspicion that the prosecutor here, in evaluating prospective jurors, targeted only black jurors for criminal background checks.

As the high court said in *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*), "[s]election procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." (*Id.* at p. 87.) Yet it has been more than 30 years since this court has found *Batson* error involving the removal of a black juror. "Racial discrimination against black jurors has not disappeared here or elsewhere during that time" (*People v. Hardy* (2018) 5 Cal.5th 56, 124 (dis. opn. of Liu, J.) (*Hardy*) [citing cases]), and if the facts in this case do not give rise to an inference of discrimination, then I am not sure what does. Because the totality of circumstances here readily establishes a prima facie case of discrimination, I respectfully dissent.

1

**I.**

The *Batson* issue here arose during jury selection for Johnson's second penalty retrial in 1992 in Sacramento County, a community that was 75.1% white and 9.3% black at the time. (Bureau of the Census, U.S. Dept. of Commerce, 1990 Census of Population, General Population Characteristics: California (1992) p. 245.) Johnson, a black man, had been convicted of murdering a white man, Aldo Cavallo, and the prosecutor planned to introduce, and did introduce, evidence that Johnson had assaulted and raped a white woman, Mary S., as an aggravating factor in support of a death sentence. It must be acknowledged at the outset that "the social, racial and sexual overtones [of the case] were precisely the kind which could 'most effectively prejudice' defendant." (*People v. Williams* (1989) 48 Cal.3d 1112, 1129.)

The fact that the contested strikes were directed at black jurors in a case involving a black defendant is also relevant. Just this year, the high court underscored that one of "the most critical" aspects of the *Batson* opinion was its express prohibition on " 'strik[ing] black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black.' " (*Flowers v. Mississippi* (2019) 588 U.S. __, __ [139 S.Ct. 2228, 2241] (*Flowers*), quoting *Batson, supra*, 476 U.S. at p. 97; see *Powers v. Ohio* (1991) 499 U.S. 400, 416 (*Powers*) ["Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred."].)

At the time of the *Batson* ruling now before us, the prosecutor had used 15 peremptory strikes to remove three of the five black jurors (60 percent) and 12 of the 35 nonblack jurors (34 percent) in the jury box. Beyond the fact of this disproportion, all three black jurors who were struck — Lois G., Sharon H., and Shanna H. — were qualified to serve as jurors in this penalty trial. All three expressed a willingness to impose the death penalty; all three indicated they would make a penalty judgment based on the facts and evidence; and none said anything on the juror questionnaire or during voir dire that would have raised an obvious concern for the prosecution.

Lois G. was a 59-year-old homeowner with two grown children. She served as the vice president of a middle school and was pursuing a doctorate degree in education. During voir dire, she explained that she handled almost all the disciplinary issues at the school, which put her in close contact with the police. On her questionnaire, she indicated that she was "close friends" with police officers. Lois G. also noted that she had been the victim of a burglary and a car theft. As to whether she would automatically vote either for death or for life without parole, she wrote, "I have no biases regarding the penalties mentioned — would listen and try to be fair in my assessment." She also wrote that she viewed the death penalty as "the law and the system we are using" and would decide whether it should be imposed "based on evidence in [the] case." When asked if she had religious objections to the death penalty, she wrote "no." During voir dire, she said her views on the death penalty were the same as what she wrote on the questionnaire, and she again expressed her willingness to impose the death penalty. Today's opinion acknowledges that there was no obvious reason for excusing Lois G. (Maj. opn., *ante*, at p. 48, fn. 7.)

Sharon H. was 39 years old, had never been married, and had no children. She worked in telecommunications at Pacific Bell and was also the executive director of a nonprofit organization she had founded. She said she works with abused children at the nonprofit and has a "heart" for "what we call throw-away kids." When read in context, Sharon H.'s statement did not make her a "clearly . . . undesirable juror from the prosecution point of view." (Maj. opn., *ante*, at p. 48, fn. 7.) During voir dire, she drew a clear distinction between "kids that are abused" and "the real difficult kids" who "have a lot of criminality in their background." She said her organization refuses to serve the second category of children, who can be "detrimental" to the organization's other clients and "to the whole neighborhood." Given Johnson's extensive juvenile criminal record, it is not obvious that Sharon H. would have sympathized with the mitigation evidence about his childhood.

In addition, Sharon H. indicated on her questionnaire that her sister had been the victim of a burglary. When asked whether she had any "extraordinary security precautions at [her] home," she wrote that she had burglar alarms. Sharon H. said she would not automatically vote for death or for life without parole. She indicated clearly that she was willing to impose the death penalty and said, "My general feeling is that some crimes warrant it — some don't." When asked if she had religious objections to the death penalty, she wrote "No." During voir dire, Sharon H. said her views on the death penalty were the same as what she wrote on the questionnaire. She explained that she does not make any decision automatically, has "been known to ask a lot of questions," and always tries to consider "[e]verything."

Shanna H. was a 40-year-old homeowner with three children in high school. She had been a state tax auditor for 19 years. On her questionnaire, she noted that she had twice been the victim of burglary. She had "extraordinary security precautions at [her] home," including security bars and lights, because "[she didn't] want anyone taking what belongs to [her]." As to her death penalty views, Shanna H. wrote that "the death penalty [should be] used in cases where another life was taken or any crimes committed against children & senior citizens." She indicated she would not automatically vote either for death or for life without parole. When asked if she had religious objections to the death penalty, she wrote "none." During voir dire, she reiterated that she would not automatically vote for or against the death penalty. She clarified that she believed the death penalty should be considered as a possibility when a life is taken, not that it should be imposed any time a life is taken. She also said that nothing in her religious beliefs dictated how she should feel about the death penalty.

When asked whether a member of her family had been arrested for a crime, Shanna H. wrote that her son had been arrested twice, including once for rape. But the significance of those incidents is not as clear as the court suggests. (Maj. opn., *ante*, at p. 47, fn. 7.) During voir dire, Shanna H. explained that her main concern with her son's criminal proceedings was the plea-bargaining process. She said she "thought everybody was suppose[d] to be tried by the jurors." Plea bargaining was not at issue in this case; Johnson was convicted in a jury trial. Furthermore, Shanna H. emphasized that her son's experiences would not affect her impartiality as a juror in this case. She said that "[t]hose are two separate issues" and that she knew "how to draw the line." She explained that as a tax auditor she

"learned every case stands on its own merit. You deal with the facts."

It is evident that these three black women had diverse backgrounds, occupations, and family circumstances. None of them expressed views clearly suggesting partiality to the defense; in fact, all of them had characteristics that might be considered favorable to the prosecution. Lois G. and Shanna H. had been victims of burglary, and Sharon H.'s sister had been a victim of burglary; Johnson had been convicted of committing murder during a burglary. (See *People v. Turner* (1986) 42 Cal.3d 711, 719.) All three jurors clearly expressed their willingness to impose the death penalty; none indicated a religious objection. And all three jurors consistently said they would not automatically vote for or against the death penalty and would instead make a decision based on the facts and evidence — exactly as we would expect a conscientious juror to do.

The removal of these three jurors occurred against the backdrop of the prosecutor's revelation one day earlier that he had run a criminal background check on a black juror, Kenneth M. The background check showed that Kenneth M. had been convicted twice of driving under the influence and arrested once for domestic violence, a record at odds with the assertion on his juror questionnaire that he had never been accused of or arrested for a crime. The prosecutor asked the trial court to investigate Kenneth M. for misconduct and suggested that he should be removed from the venire. (Kenneth M. was not removed for cause and was eventually struck by the prosecution during the selection of alternate jurors.)

In the trial court, there was no dispute that Kenneth M. had provided inaccurate information on his questionnaire. Instead, defense counsel wondered why the prosecutor, before any individual voir dire of Kenneth M., had chosen Kenneth M. for a criminal background check. Today's opinion says defense counsel's concern was that "the prosecutor appeared to conduct a criminal background check on only Kenneth M." (Maj. opn., *ante*, at p. 44.) But what defense counsel actually said was: "[Kenneth M.] is a Black or indicates on his form that he is Black, and *I am wondering if Mr. Mullins [the prosecutor] just checked all the Black prospective jurors with respect to any criminal record.*" (Italics added.)

At this point, the prosecutor replied, "I don't think I am obliged to answer that inquiry," and went on to explain that he did not conduct criminal background checks on all prospective jurors. He said his approach was "to check certain jurors when they spark my interest" or "if I find something on the questionnaire that sparks my interest." Defense counsel asked to "have the information as to all the jurors that Mr. Mullins ran." When the prosecutor refused, defense counsel made clear: "I think a Wheeler Motion is always something that could occur in any case of this nature, and I think we should always be aware of what's going on and what's happening with respect to any potential Wheeler Motion that may be made, and I don't see why Mr. Mullins would object to informing us as to which jurors he ran a check on so that we have the same information with respect to those jurors." (See *People v. Wheeler* (1978) 22 Cal.3d 258 [California's forerunner to *Batson*].) The prosecutor again refused, claiming there was no prima facie case for any *Wheeler* motion.

The prosecutor's vague and evasive statements are cause for suspicion. While stating that he ran background checks on jurors who "spark my interest," the prosecutor never pointed to anything about Kenneth M.'s questionnaire that sparked his interest or might have suggested Kenneth M.'s criminal history warranted further investigation. And because individual voir dire of Kenneth M. had not yet occurred, there is no suggestion that something about Kenneth M.'s appearance or demeanor sparked the prosecutor's interest. Further, when directly asked whether he had targeted all black jurors for criminal background checks, the prosecutor refused to answer. When defense counsel made clear that this issue would be relevant to "any potential Wheeler Motion," the prosecutor again refused to answer. Even assuming the prosecutor was under no obligation at that point to disclose how he had selected jurors for background checks, it is suspicious that he did not simply answer "no" when directly asked whether he "just checked all the Black prospective jurors." If the prosecutor had not targeted only black jurors, why didn't he say so? Answering "no" would have put to rest any notion that he had targeted black jurors, without requiring any affirmative description of how he had selected jurors for background checks.

It is true that "the prosecutor repeatedly accepted the jury when two African-American jurors were on the panel, and ultimately accepted a panel with three African-American jurors." (Maj. opn., *ante*, at p. 43.) But the prosecutor accepted the third black juror on the panel after the three contested strikes had resulted in two *Batson* motions. (Cf. *Miller-El v. Dretke* (2005) 545 U.S. 231, 250 (*Miller-El*) ["This late-stage decision to accept a black panel member willing to impose a death sentence does not . . . neutralize the early-stage decision

to challenge a comparable venireman . . . ."].)  And as for the prosecutor's acceptance of the other two black jurors on the panel, this fact may lessen but hardly dispels an inference of discrimination.  (See dis. opn. of Cuéllar, J., *post,* at pp. 12–13.)  Even if the totality of circumstances here does not amount to proof of discrimination, it is more than enough to raise a significant question about the prosecutor's intent.  In situations like this, "[t]he inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." (*Johnson v. California* (2005) 545 U.S. 162, 172.)

In sum, the record readily supports an inference of discrimination, and the trial court erred in failing to require the prosecutor to state his reasons for striking three black jurors.  Because this penalty trial occurred 27 years ago, there is no "realistic possibility" that the reasons for the strikes "could be profitably explored further on remand at this late date." (*Snyder v. Louisiana* (2008) 552 U.S. 472, 486 (*Snyder*).)  The only available remedy is reversal of the penalty verdict, for we cannot be confident, in light of the *Batson* error, that Johnson was sentenced by a jury selected without regard to race.

## II.

In finding no inference of discrimination arising from disproportionate strikes of black jurors, today's decision is not an anomaly in our case law.  In another death penalty decision filed today, the court finds no prima facie case of discrimination where the prosecution's removal of four black jurors was likely "substantially disproportionate to the representation of African-Americans in the jury pool." (*People v. Rhoades* (Nov. 25, 2019,

S082101) __ Cal.5th __ [p. 52] (*Rhoades*).) These decisions come on the heels of another recent case finding no inference of discrimination arising from the prosecution's removal of five out of six black jurors in the capital trial of a black defendant. (*People v. Reed* (2018) 4 Cal.5th 989, 998–1003.) And that case followed yet another decision finding no inference of discrimination where the prosecutor struck two out of three black jurors in the capital retrial of a black defendant accused of raping and murdering a white woman, where the first trial had resulted in a hung jury with the lone black juror as the holdout. (*People v. Harris* (2013) 57 Cal.4th 804, 833–838 (*Harris*).)

The facts of each case are unique, and the court must decide each case based on the circumstances presented. But it can be illuminating to take a step back and see the forest, not just the trees. As I explain in *Rhoades*, this court has reviewed the merits of a first-stage *Batson* denial in 42 cases (all death penalty appeals) during the 14 years since *Johnson v. California*. (*Rhoades*, *supra*, __ Cal.5th __ [p. 3] (dis. opn. of Liu, J.).) "Not once did this court find a prima facie case of discrimination — even though all 42 cases were tried before *Johnson v. California* disapproved the 'strong likelihood' standard and held that 'an inference of discrimination' is enough." (*Ibid.*) Equally remarkable is the fact that it has been more than 30 years since this court has found any type of *Batson* error involving the removal of a black juror. (See *People v. Snow* (1987) 44 Cal.3d 216.) This is despite the fact that "[t]he high court's opinion [in *Batson*] responded specifically to the pernicious history of African Americans being excluded from jury service, calling such exclusion 'a primary example of the evil the Fourteenth Amendment was designed to cure.'"

(*Hardy*, *supra*, 5 Cal.5th at p. 124 (dis. opn. of Liu, J.), quoting *Batson*, *supra*, 476 U.S. at p. 85.)

A few months ago, the high court in *Flowers* reviewed our nation's history of excluding African Americans from jury service and, with that context in mind, underscored the core principles of *Batson*. (*Flowers*, *supra*, 588 U.S. at p. __ [139 S.Ct. at pp. 2238–2242].) *Flowers* went on to say: "In the decades since *Batson*, this Court's cases have vigorously enforced and reinforced the decision, and guarded against any backsliding," citing *Foster v. Chatman* (2016) 578 U.S. __ [136 S.Ct. 1737], *Snyder*, *supra*, 552 U.S. 472, and *Miller-El*, *supra*, 545 U.S. 231 — all cases involving the removal of black jurors. (*Flowers*, at p. __ [139 S.Ct. at p. 2243].) Clearly, racial discrimination against black jurors has persisted. Yet no comparable record of vigorous enforcement appears in our case law over the same period. (Cf. *People v. Gutierrez* (2017) 2 Cal.5th 1150 [this court's lone finding of *Batson* error in the past 18 years].)

Although the *Batson* principle has been extended in various ways, the high court's decisions indicate that the removal of black jurors from the criminal trial of a black defendant remains the paradigmatic case. Such exclusion results in three dimensions of harm. First, "the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." (*Batson*, *supra*, 476 U.S. at p. 85.) Second, "by denying a person participation in jury service on account of his race, the State unconstitutionally discriminate[s] against the excluded juror." (*Batson*, at p. 87.) "Other than voting, serving on a jury is the most substantial opportunity that most citizens have to participate in the democratic process."

(*Flowers*, *supra*, 588 U.S. at p. __ [139 S.Ct. at p. 2238].) For "otherwise qualified and unbiased persons" like Lois G., Shanna H., and Sharon H., exclusion "from the petit jury solely by reason of their race" is "a practice that forecloses a significant opportunity to participate in civic life." (*Powers*, *supra*, 499 U.S. at p. 409.) The exclusion of African Americans, in particular, has long been condemned as a denial of equal citizenship, " 'an assertion of their inferiority, and a stimulant to . . . race prejudice . . . .' " (*Flowers*, at p. __ [139 S.Ct. at p. 2239], quoting *Strauder v. West Virginia* (1880) 100 U.S. 303, 308.) And third, the frequent and disproportionate exclusion of fully capable and qualified black citizens from jury service breeds distrust of law enforcement and "undermine[s] public confidence in the fairness of our system of justice." (*Batson*, at p. 87.) It is for this reason that the high court in *Batson* said "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." (*Ibid.*)

"Today, as when *Batson* was decided, it is a troubling reality, rooted in history and social context, that our black citizens are generally more skeptical about the fairness of our criminal justice system than other citizens." (*Harris*, *supra*, 57 Cal.4th at p. 865 (conc. opn. of Liu, J.).) The high court in recent years has spoken with clarity, regularity, and urgency about the continuing need to eliminate racial discrimination from our justice system. It has described "racial bias" as "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." (*Peña-Rodriguez v. Colorado* (2017) 580 U.S. __, __ [137 S.Ct. 855, 868].) It has said "[t]he duty to confront racial animus in the justice system" belongs to the courts and "is not the legislature's alone." (*Id.* at

p. __ [137 S.Ct. at p. 867].)  It has said " '[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice.' " (*Buck v. Davis* (2017) 580 U.S. __, __ [137 S.Ct. 759, 778].)  And it has said clearly and recently: "Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process."  (*Flowers, supra,* 588 U.S. at p. __ [139 S.Ct. at p. 2242].)

It is time that we, too, bring a greater sense of urgency to ferreting out racial discrimination in the criminal justice system.  With respect to enforcing *Batson*, this means we must not "elevate[] the standard for establishing a prima facie case beyond the showing that the high court has deemed sufficient to trigger a prosecutor's obligation to state the actual reasons for the strike."  (*Harris, supra,* 57 Cal.4th at p. 864 (conc. opn. of Liu, J.).)  Viewing today's decision in its particulars and in the broader context of our case law, I continue to "have serious doubts as to whether our jurisprudence has held true to *Batson*'s mandate."  (*Id.* at p. 866 (conc. opn. of Liu, J.); see *Rhoades, supra,* __ Cal.5th __ [pp. 16–22] (dis. opn. of Liu, J.).)  I respectfully dissent.

**LIU, J.**

PEOPLE v. JOHNSON

S029551


Dissenting Opinion by Justice Cuéllar


Racial discrimination in jury selection is unlawful. But "there can be no dispute," the United States Supreme Court warns us, that the system of peremptory challenges — which allows a party to dismiss a juror for any reason, or no reason at all — "permits 'those to discriminate who are of a mind to discriminate.' " (*Batson v. Kentucky* (1986) 476 U.S. 79, 96 (*Batson*).) Only if courts are vigilant can society prevent prejudiced or unscrupulous lawyers from using peremptory challenges as tools for unlawful discrimination. So when a trial court has even a *suspicion* of discriminatory excusals, clear precedent requires it to act by asking the party exercising the peremptory challenge to explain why the juror is being excused.

That's a far cry from what happened in this case. The trial court had compelling evidence that the prosecutor, even before striking any African American jurors, had singled out African American jurors for special — and unlawful — scrutiny. Yet when the prosecutor sought to excuse a majority of the African American prospective jurors from the jury that would decide whether defendant Joe Edward Johnson would be subject to the death penalty, no one asked the prosecutor to explain his reasons.

We should not affirm the trial court's penalty phase verdict on this record. A careful review of that record reveals more than sufficient evidence to suggest that the prosecutor's

1

peremptory excusal of African American prospective jurors may have been based on their race. First, issues of race were salient in this case — defendant is African American, while the victims of his murder and rape were white — which provided the prosecutor a plausible motive to minimize the number of jurors he might stereotypically perceive as favorable to Johnson. Second, the prosecutor appeared to single out African American jurors in conducting his extrajudicial criminal history investigation, and he pointedly refused to deny this when he was questioned about it. Third, the prosecutor was successful in targeting the African American prospective jurors: he not only removed most of the African Americans who made it into the jury box, but he exercised peremptory challenges against African American jurors at a far higher rate than other jurors. Fourth, this record does not establish race-neutral reasons that would necessarily dispel any inference of bias in striking these jurors. Nor does the majority offer any. What the record does reveal is a motive for the prosecutor to discriminate against African American jurors, a plan to effectuate that discrimination, and the prosecutor's success in removing such jurors.

Yet not once did the trial court ask the prosecutor why he struck the African American jurors. If I were a trial judge presented with these circumstances, I would consider it my duty under the Constitution to ask the prosecutor his reasons for excusing them. A court's clear-as-day responsibility is to do so whenever " 'the totality of the relevant facts give rise to an inference of discriminatory purpose.' " (*Johnson v. California* (2005) 545 U.S. 162, 168 (*Johnson*).) That we're reviewing this record on appeal does not relieve us of this burden. In this case, as the majority admits, our role is just like the trial court's: we

must review the record " 'independently.' " (Maj. opn., *ante*, at p. 40; accord, *Wade v. Terhune* (9th Cir. 2000) 202 F.3d 1190, 1199.)

The majority opinion purports to undertake such a review and concludes that the record is insufficient to raise an inference of discrimination. But it does so by mischaracterizing the worst of the prosecutor's misconduct. (Maj. opn., *ante*, at p. 44.) It glosses over the prosecutor's success in achieving his goal. (*Id.* at pp. 42-43.) And it artificially compartmentalizes the relevant facts to avoid confronting the disturbing mosaic these facts reveal. While it can thereby safely conclude that each isolated fact does not raise a discriminatory inference (*id.* at pp. 42, 46), that's not how we're supposed to review claims of discrimination in jury selection. (See *Flowers v. Mississippi* (2019) 588 U.S. ___ [139 S.Ct. 2228, 2235] (*Flowers*).) What's worse, it sets a bad example for trial courts adjudicating such claims in the future. I have no choice but to dissent, with respect.

## I.

We analyze a claim of discrimination in jury selection in three distinct steps. First, the opponent of a peremptory strike must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges. Second, if the opponent of the strike successfully makes out a prima facie case, the burden shifts to the strike's proponent, who must explain the basis for excusing the juror by offering permissible, nondiscriminatory justifications. Third, if the party who used a strike offers a nondiscriminatory reason, the trial court must decide whether the strike's opponent has proved the ultimate

question of purposeful discrimination. (*Johnson, supra*, 545 U.S. at p. 168.)

This case involves only the "low threshold" inquiry at the first step. (*People v. Scott* (2015) 61 Cal.4th 363, 384 (*Scott*).) The threshold is low because "[t]he *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. [Citation.] The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." (*Johnson, supra*, 545 U.S. at p. 172.) Our task is to examine the record so we can determine whether "discrimination *may* have occurred." (*Id*. at p. 173, italics added.) Where (as here) the trial court failed to inquire into the prosecutor's reasons, we may affirm only if "[n]o reasonable inference" of discrimination could arise from the totality of the relevant facts. (*State v. Robbins* (N.C. 1987) 356 S.E.2d 279, 296; accord, *People v. Howard* (2008) 42 Cal.4th 1000, 1018.)

## A.

Our state and federal Constitutions forbid prosecutors from striking "a black juror based on an assumption or belief that the black juror would favor a black defendant." (*Flowers, supra*, 139 S.Ct. at p. 2241; accord, *People v. Wheeler* (1978) 22 Cal.3d 258, 281.) In practice, though, a prosecutor may nonetheless harbor just such a belief and try to capitalize on it. So we have deemed it "especially relevant" to the discrimination inquiry whether the defendant and the excused jurors are members of the same identified group and whether the victims are members of the group to which a majority of the remaining

jurors belong. (*People v. Reed* (2018) 4 Cal.5th 989, 999 (*Reed*); see *People v. Rhoades* (Nov. 25, 2019, S082101) ___ Cal.5th ___ [p. 62] (*Rhoades*) ["the racially charged nature of a case may properly inform an appellate court's consideration of whether a pattern of strikes establishes a prima facie case of discrimination"].) Both factors are present here. Johnson, like the prospective jurors who were the subject of the *Batson/Wheeler* motion, is African American. The murder victim, Aldo Cavallo, was white. So is Mary S., who was the victim in perhaps the most incendiary act offered in aggravation: a brutal assault and rape at gunpoint, in her church after mass. So the race of the defendant and the victims in this case does raise "heightened concerns about racial bias in jury selection." (*Rhoades*, at p. __ [p. 65].) [1]

The racially charged nature of this prosecution would not have been lost on a prosecutor who sought to discriminate in jury selection. (See *Smith v. U.S.* (D.C. 2009) 966 A.2d 367, 376-

---

[1] Yet contrary to our clear precedent, the trial court did not find these circumstances "especially relevant" or worthy of "heightened concern." Rather, the trial court began its analysis of the *Batson/Wheeler* motion by asserting — incorrectly — that "if you compute the number of Caucasians that were available, his exclusion rate for them would be the same or greater than for the black persons who have come into the jury box." Defense counsel diplomatically chose "not to disagree with [the court's] math so much" and focused instead on the especially relevant fact that "Mr. Johnson is not white. He's black," like the jurors who were the subject of the *Batson/Wheeler* motion. Unfortunately, the trial court erroneously failed to accord that fact — or the race of the victims — any heightened concern. It first offered a non sequitur — "you don't have to be black to make this motion" — and then summarily dismissed defense counsel's stated concerns: "So, it isn't just race specific to a defendant. That's just a side issue that we need not get into."

377.) Which is why we apply " 'closer scrutiny' " to the prosecution's peremptory challenges in this case. (*Id.* at p. 377; see *Powers v. Ohio* (1991) 499 U.S. 400, 416 ["Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred"].)

## B.

"Searching" is not a word we can plausibly apply to the majority's scrutiny of the record.

Among the most troubling aspects of this case is the prosecutor's unwillingness — or inability — to deny a direct accusation that he had singled out the African American jurors in his criminal history investigation. But the majority's analysis nowhere addresses this remarkable, if implicit, admission of discriminatory conduct. Instead, it erects and then knocks down an argument of its own creation. In the majority's view, Johnson is "arguing that the prosecutor appeared to conduct a criminal background check on only Kenneth M." (Maj. opn., *ante*, at p. 44.) The majority then hastens to point out how the record indicates "that Kenneth M. was not the only juror he investigated"; it shows merely "that Kenneth M. may have been the only juror checked who provided inaccurate information on his questionnaire." (*Ibid*.) The majority is correct on both points, but neither responds to the argument Johnson makes. Indeed, Johnson explicitly recognized that "the prosecutor apparently investigated more than one juror."

What matters in this case is not how many jurors the prosecutor investigated, but what triggered his selective investigation of certain jurors in the first place. As Johnson explains clearly enough, "The prosecutor's explanation that he might investigate a particular juror if 'something on the questionnaire sparks my interest' [citation] does nothing to dispel the suspicion that race played a role in what sparked his interest." When we examine the *totality* of the relevant facts, it is fair to infer the prosecution appeared to have a plan to target the African American jurors.

Consider the relevant facts. The prospective jurors filled out a questionnaire. Prior to the voir dire of *any* African American juror — and armed only with that questionnaire, which included information about the juror's race — the prosecutor announced he had run a computer criminal history check on "some of the jurors" and happened to discover that Kenneth M., an African American prospective juror, had two misdemeanor convictions. Those convictions were inconsistent with a response on his jury questionnaire, which asked whether he had ever been accused of or arrested for a crime.

Defense counsel immediately wondered just what it was about Kenneth M. that would have sparked the prosecutor to conduct a special investigation into that particular juror. Indeed, defense counsel noted the questionnaire itself didn't indicate that the juror was lying "or lead one to suspect that maybe he's misinforming the Court or us with his background." Yet the prosecutor admitted that he had not checked "all the jurors so far" — indeed, he said that "takes too much time. I don't have time to do that." Given the racially charged nature of the prosecution, defense counsel asked the question that would be on anyone's mind: "I am wondering if [the prosecutor]

just checked all the black prospective jurors with respect to any criminal record."

Under ordinary circumstances, that seems like a straightforward question that should be easy to answer: Were you racially profiling the African American prospective jurors? An answer wouldn't reveal the prosecutor's legitimate strategy or thinking. What would make the question daunting for the prosecutor to answer, though, is if he was in fact racially profiling the African American jurors. To say yes would be admitting to what the majority calls "a prima facie case of discrimination." (Maj. opn., *ante*, at p. 44, fn. 5.) To say no would be lying to a tribunal, an ethical violation. (Rules Prof. Conduct, rule 3.3(a)(1).) A natural inference from the prosecutor's actual response — "I don't think I am obliged to answer that inquiry" — is that the prosecutor wanted to avoid making that choice. The basis for the discriminatory inference became even stronger when the prosecutor continued not to answer, even when the court made clear the price of his silence: "Obviously, if we reach a stage in the proceeding in which there is some issue of *Wheeler*-type concerns, then the state of mind and the purpose of the prosecutor then would become relevant."[2]

---

[2] The record does not indicate that the trial court ever considered this pivotal fact in denying Johnson's *Batson* challenge, however. Fortunately, as an appellate court, "we have the benefit of being able to examine the record in more detail, and at a great deal more leisure, than a trial court in the midst of jury selection." (*Rhoades, supra,* ___ Cal.5th ___ [p. 55, fn. 16].) But we must actually *examine the record in detail* to get the benefit of this perspective. The majority opinion falls short in this regard.

The majority notes the absence of any significant disparities in the prosecutor's questioning of the African American jurors *in voir dire*. (Maj. opn., *ante*, at p. 44.) But this glosses over the fact that the best evidence of a disparity in the overall selection of jurors was unavailable precisely because the prosecutor refused to answer a direct question about that disparity. (See *Johnson*, *supra*, 545 U.S. at p. 171, fn. 6, citing *Vajtauer v. Comm'r of Immigration* (1927) 273 U.S. 103, 111; *Vajtauer*, at p. 111 [" 'Silence is often evidence of the most persuasive character' "].)

When the majority finally gets around to acknowledging that direct question — and the inferences to be drawn from the prosecutor's unwillingness or inability to answer — its analysis proves less than persuasive. The majority speculates that maybe the prosecutor didn't want to encourage further probing into his "trial strategy." (Maj. opn., *ante*, at p. 45.) But no legitimate trial strategy can encompass racial profiling of prospective jurors. Moreover, the prosecutor's reticence naturally culminated in the repeated follow-up requests that a simple "yes" or "no" could have avoided. Such conduct matters not because the prosecutor was legally obligated under *Batson/Wheeler* to answer defense counsel's question. What matters instead is that the record taken as a whole — the racial atmospherics of the charged crimes, the absence of anything in Kenneth M'.s questionnaire responses that would trigger a selective background inquiry, and the fact that Kenneth M. and defendant were of the same race — would lead any reasonable observer to wonder whether the prosecutor had racially profiled him (and perhaps the rest of the African American jurors). Even if it's conceivable the prosecutor declined to address this issue simply because he wasn't legally *obligated* to do so, it's *also*

plausible that the prosecutor declined to provide a response because he was caught on the horns of a dilemma: either admit his discriminatory intent and jeopardize the venire, or deny it and risk a disciplinary inquiry.

Of course, Johnson's burden at this stage of the inquiry is not to *prove* that the prosecutor's criminal history investigation was race-based. All he needs to show is that the record raised an *inference* of discriminatory intent. Because there can be no legitimate explanation for targeting only the African American jurors for a criminal history check, such disparate treatment — if it occurred — would be powerful evidence of discriminatory intent. (See *Flowers*, *supra*, 139 S.Ct. at pp. 2246-2248.)

## C.

The record also supports the inference that the prosecutor's efforts to target the African American jurors was not limited to criminal history investigations. As the majority concedes, the prosecutor struck more than half of the African American jurors during voir dire — but fewer than a third of the other jurors. Moreover, the prosecutor used 21 percent of his strikes (4/19) to remove African American jurors — which was 62 percent higher than their representation in the relevant pool (7/54).

At least in this case, such disparities tend to support an inference of bias. (See, e.g., *Fernandez v. Roe* (9th Cir. 2002) 286 F.3d 1073, 1078 [inference established where "[t]he prosecutor struck four out of seven (57%) Hispanics, . . . thus supporting an inference of discrimination. While Hispanics constituted only about 12% of the venire, 21% (four out of nineteen) of the prospective juror challenges were made against Hispanics"]; *Turner v. Marshall* (9th Cir. 1995) 63 F.3d 807, 813 [inference

established when the prosecutor used 56 percent of her challenges against African Americans, who comprised only 30 percent of the pool — a relative disparity of 87 percent], overruled on other grounds in *Tolbert v. Page* (9th Cir. 1999) 182 F.3d 677, 685; *U.S. v. Alvarado* (2d Cir. 1991) 923 F.2d 253, 255-256 [inference established where the prosecutor challenged 50 percent of minority venirepersons, who represented only 30 percent of the pool]; *id.* at p. 256 ["We think a challenge rate nearly twice the likely minority percentage of the venire strongly supports a *prima facie* case under *Batson*"]; *Cazares v. Evans* (C.D.Cal. Nov. 8, 2010, No. CV 05-1045-VBF(JC)) 2010 U.S. Dist. Lexis 142142, *43 [inference established where "[t]he prosecutor had used four of 15 challenges (i.e., 27 percent of its challenges) to remove Hispanic jurors, removing 57 percent of the available Hispanic jurors, in a case where Hispanics comprised roughly 19 percent of the jury pool"].)

The majority endeavors to avoid this conclusion by misdirecting the focus of the inquiry. According to the majority, these statistics "do not by themselves suggest an inference of discrimination." (Maj. opn., *ante*, at p. 42.) Yet no one claims they do. Indeed, the small sample size limits to some extent the import of these disparities. (See *Carmichael v. Chappius* (2d Cir. 2017) 848 F.3d 536, 549, fn. 79.) What we must do, though, is consider the disparities in the context of all the other relevant facts. (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158.) Those facts include the racially charged aspects of the trial — as well as a strong suspicion that the prosecution may have targeted the African American jurors for special scrutiny when conducting background checks. It is in light of those facts that we must consider statistical evidence of the disparate rate at which the prosecution excused jurors who were African American relative to jurors who were not. Reviewing

the circumstances independently — as the majority recognizes we must — I'd say at a minimum it rises to the "sure looks suspicious" standard. (Cf. *Carmichael*, at pp. 548-549 ["Had we been presiding over jury selection in Carmichael's case in the first instance, we might very well have concluded that Carmichael made out a *prima facie* showing of race discrimination"].)

The majority casts aside such concerns by purporting to rely on *Reed*, *supra*, 4 Cal.5th 989. But that case is readily distinguished. The prosecutor in *Reed* used 44 percent of his strikes to excuse African American jurors, which was only 29 percent higher than their representation in the venire (34 percent). (*Id*. at p. 1000.) Here, though, the strike rate for African Americans was *62 percent* higher than their representation in the venire. Nor was there any discussion in *Reed* of a disparity in the exclusion rate for African American jurors relative to the rest of the pool. In this case, by contrast, the disparity in the exclusion rate was substantial. The prosecutor removed 57 percent of the African American jurors, but only 32 percent of the remaining jurors — an absolute disparity of 25 percent and a relative disparity of 78 percent.

True: the jury that decided Johnson's fate included three African Americans. But their presence, as the majority concedes, " 'does not necessarily settle all questions about how the prosecution used its peremptory challenges.' " (Maj. opn., *ante*, at p. 43, quoting *Reed*, *supra*, 4 Cal.5th at p. 1000.) Indeed, while their presence may " 'help lessen the strength of any inference of discrimination that the pattern of the prosecutor's strikes might otherwise imply' " (*ibid*.), the lessening of the inference in this case is slight. After all, the prosecutor did not have enough peremptory challenges left to remove each of the remaining African American jurors *and* Kenneth M. (See maj. opn., *ante*, at p. 42.) Moreover,

12

as luck would have it, jurors in that racial group "were overrepresented in the box compared to their representation in the candidate pool." (*Id.* at p. 43.) The prosecutor likely feared he could not have excused additional African American jurors without attracting uncomfortable attention.

At core, the essential question that merits attention here is whether racial discrimination may have occurred in the excusal of the jurors that are the subject of the *Batson / Wheeler* motion, " 'not on the fact that other blacks may remain on the jury panel.' " (*Holloway v. Horn* (3d Cir. 2004) 355 F.3d 707, 729 [finding an inference of discrimination, despite the presence of three African American jurors on the panel]; *U.S. v. Alvarado*, *supra*, 923 F.2d at p. 256 ["The discrimination condemned by *Batson* need not be as extensive as numerically possible"].) This is so because our state and federal Constitutions prohibit efforts to reduce the number of African American jurors, not just efforts to bar them entirely. (See *People v. Snow* (1987) 44 Cal.3d 216, 225 [allowing a prosecutor to " ' "avoid the appearance of systematic exclusion by simply passing the jury while a member of the cognizable group that he wants to exclude is still on the panel" ' " would " ' "ignore[] the fact that other members of the group may have been excluded for improper, racially motivated reasons" ' "]; accord, *Sanchez v. Roden* (1st Cir. 2014) 753 F.3d 279, 288, 306-307 [finding an inference of discrimination, despite the presence of five African Americans on the jury panel]; *U.S. v. Battle* (8th Cir. 1987) 836 F.2d 1084, 1086 [finding an inference of discrimination, despite the presence of two African Americans on the panel; "the striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors"]; *People v. Bolling* (N.Y. 1992) 582 N.Y.S.2d 950, 953-954 [finding

an inference despite the presence of five African Americans on the panel]; see generally *U.S. v. David* (11th Cir. 1986) 803 F.2d 1567, 1571 ["[T]he command of *Batson* is to eliminate, not merely to minimize, racial discrimination in jury selection"].)  The majority, unfortunately, fails to grant Johnson the full measure of constitutional protection to which he is entitled.

## D.

Taken together, these circumstances support an inference that the prosecutor was targeting the African American jurors. What should have triggered further concerns among the members of the majority is the absence of any "nondiscriminatory reasons for [the] peremptory challenge[s] that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias." (*Scott*, *supra*, 61 Cal.4th at p. 384.)

Consider, for example, Prospective Juror Lois G.  As the majority concedes, there are no obvious race-neutral reasons for this African American juror's excusal.  She would have been, by all accounts, a more than capable juror.  She was a 59-year-old middle school administrator who was pursuing her doctorate in education.  Among her responsibilities was student discipline.  She assisted teachers when problems arose and interacted with the police "a lot."  She described her school's "biggest problems" as guns, knives, and drugs, and said the prevalence of gangs was "real disheartening."

Nor did her views on law enforcement seem disqualifying, either.  She had twice served on a jury that reached a verdict, one of which was a homicide case.  Her close friends included police officers, and she had herself been the victim of a burglary and a car theft.  (See *People v. Turner* (1986) 42 Cal.3d 711, 719 [finding an inference of discrimination where the prosecutor struck the

first two African Americans in the box:  each had been a victim of crime, one had a friend who was a police officer, and the defendant was a member of the excluded group but his alleged victims were white].)  She believed courts were fair in sentencing criminal defendants, at least in the cases with which she was familiar.  She was not predisposed to vote for or against the death penalty, and said her judgment would be based on the evidence in the case.  Most importantly, she intended to be fair and listen to all the facts before coming to a decision.

The reasons conjured in the Attorney General's brief for the first time in this court are strained and fall far short of "dispelling" an inference of discriminatory intent.  (*Reed*, *supra*, 4 Cal.5th at p. 1001.)  He contends first that Lois G. "harbored a certain skepticism or distrust regarding the fairness of the criminal justice system."  As proof, he claims that she replied "equivocally" when asked about the fairness of criminal sentencing — but her questionnaire answer does not reveal any such equivocation.  In response to a question soliciting her view whether courts are "too lenient, too strict, or usually fair and appropriate in sentences handed down to criminal offenders," the juror responded, "In cases I've heard about the court seemed to be fair.  It is difficult to judge if you're not part of the situation."  In any event, the prosecutor did not ask any follow-up questions on this topic, as he "probably would have done if [the issue] had actually mattered."  (*Miller-El v. Dretke* (2005) 545 U.S. 231, 246.)

The other proffered reason is a hypothesis that the prospective juror "would be particularly sympathetic to the mitigating evidence of childhood abuse and alleged mental illness" because of her "career choice[]."  This seems quite unlikely.  A substantial part of the defense strategy was to offer psychiatric and psychological experts to opine about Johnson's mental

15

disorders. (See maj. opn., pp. 14-16.) Yet Lois G. agreed with the prosecutor that the value of those opinions could only be as good as the information underlying those opinions: "I think you have to assess the facts because otherwise you're biased if you are not looking at — if you look at somebody's opinion that creates another problem because everybody has a different opinion . . . ."

Both of these belatedly hypothesized reasons, moreover, constitute rank speculation that the prosecutor excused the juror for a nondiscriminatory reason. The prosecutor was never asked to offer his reasons for excusing Lois G. — or any of the other African American prospective jurors. It's certainly *possible* that if the prosecutor had been asked to provide his reasons, he might've offered these two. And it's possible, I suppose, that the trial court might've credited these reasons as sincere and not pretextual — even though the record tends to cast doubt on both of them. In the absence of that actual exchange, though, what's obvious is the lack of a compelling or even modestly convincing reason — other than her race — for excusing Lois G. So this factor, too, weighs in favor of an inference of discriminatory intent. (See *Boyd v. Newland* (9th Cir. 2006) 467 F.3d 1139, 1147.)

## II.

The stakes are as high as they can get in this case. Johnson was sentenced to death in a proceeding that may have been tainted by racial discrimination in selecting the jury that decided his fate. Yet the majority unjustifiably declines to investigate whether that inference of discrimination became a reality.

But there's more. By failing to grapple with what the prosecutor actually did, the court unwittingly provides a road map for ensuring that unlawful discrimination evades judicial scrutiny. The majority effectively encourages prosecutors to frontload their

unlawful targeting of disfavored groups: single out the disfavored group for intensive investigation prior to jury selection, use the results to disqualify as many members of that cognizable group as possible in voir dire, and then stonewall any inquiry into whether the investigation was mere racial profiling. The cost to a prosecutor bent on discriminating? Nothing. Getting a leg up in striking disfavored groups from the jury pool, so that fewer discriminatory excusals are needed during voir dire? Priceless. But justice — and the appearance of justice — are prized less. (See *Batson, supra,* 476 U.S. at p. 87 ["Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice"]; cf. *Campbell v. Louisiana* (1998) 523 U.S. 392, 399.)

The prosecutor excused most of the African Americans in the jury pool. There's more than enough evidence to raise an inference that the prosecutor may have acted with discriminatory intent in doing so. We should not affirm the judgment without demanding the prosecutor provide his reasons for excusing those prospective jurors. And we should not turn a blind eye when a prosecutor makes apparent efforts to single out African American prospective jurors for criminal history investigations. Because the majority's decision all but bestows its blessing on such conduct from the prosecution, I must dissent with respect.

**CUÉLLAR, J.**

**I Concur:**

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Johnson

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S029551
**Date Filed:** November 25, 2019

_____

**Court:** Superior
**County:** Sacramento
**Judge**: Peter Mering

_____

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, under appointments by the Supreme Court, Kent Barkhurst and Andrew C. Shear, Deputy State Public Defenders, for Defendant and Appellant.

Brian Stull; Linda Lye; Lydia Gray; and David Loy for ACLU, ACLU of Northern California, ACLU of Southern California and ACLU of San Diego and Imperial Counties as Amici Curiae on behalf of Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Ward A. Campbell, Stephanie A. Mitchell and Melissa Lipon, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Andrew C. Shear
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA 94607
(510) 267-3300

Melissa Lipon
Deputy Attorney General
1300 I Street
Sacramento, CA 95814
(916) 210-7662